2003 OK CR 12

**John Fitzgerald HANSON, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2001–717.**

Court of Criminal Appeals of Oklahoma.

June 11, 2003.

---

Jack E. Gordon, Jr., Claremore, OK, Attorney for Defendant at trial.

Sharon Ashe, Assistant District Attorney, Tulsa, OK, Attorney for the State at trial.

James H. Lockard, Deputy Division Chief Capital Direct Appeals Division, Jamie D. Pybas, Division Chief Direct Appeals Division, Oklahoma Indigent Defense System, Norman, OK, Attorneys for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, David M. Brockman, Assistant Attorney General, Oklahoma City, OK, Attorneys for Appellee on appeal.

### *OPINION*

CHAPEL, Judge.

¶1 John Fitzgerald Hanson was tried by jury and convicted of Count I, First Degree Malice Murder in violation of 21 O.S.1991, § 701.7(A), and Count II, First Degree Felony Murder in violation of 21 O.S.1991, § 701.7(B), in the District Court of Tulsa County, Case No. CF–99–4583.[1] As to Count I, the jury found three aggravating circumstances: (1) Hanson was previously convicted of a felony involving the use or threat of force; (2) there existed a probability that Hanson would pose a continuing threat to society, and (3) that Hanson knowingly created a great risk of death to more than one person. As to Count II, the jury found two aggravating circumstances: (1) Hanson was previously convicted of a felony involving the use or threat of force; and (2) there existed a probability that Hanson would pose a continuing threat to society. In accordance with the jury's recommendation the Honorable Linda G. Morrissey sentenced Hanson to death (Count I) and life without the possibility of parole (Count II). Hanson appeals from these convictions and sentences. After thorough consideration of the briefs, exhibits, transcripts and record, we find that pervasive error in jury selection and the second stage requires us to remand Count I for resentencing.

¶2 Hanson and Victor Miller took Mary Agnes Bowles from the Promenade Mall in Tulsa sometime between 4:15 p.m. and 5:50 p.m. on August 31, 1999. They had already robbed two liquor stores, and wanted to use Bowles's car in another robbery. Hanson held Bowles down in the back seat while Miller drove to an isolated area near Owasso. He turned down a road leading to a dirt pit. The pit's owner, Mr. Thurman, was there loading a dump truck for a delivery. While speaking to his nephew, Jim Moseby, on his cell phone, Thurman said he saw a car circling through the pit. After this conversation, Miller shot Thurman four times with a chrome .380 revolver. Miller drove a short distance away. He stopped at an overgrown roadside. Hanson got out with Bowles and, using a 9mm semiautomatic pistol, shot her between four and six times as she lay on the ground. Before leaving the scene, they partially covered her with branches. Neighbors heard several shots coming from the pit area and saw an unfamiliar car drive by. They found Thurman lying near his dump truck at the entrance to the road. Thurman was taken to the hospital; he never regained consciousness and died on September 14. Bowles's decomposed body was found on September 7.

¶3 Hanson and Miller drove Bowles's car to the Oasis Motel. Hanson asked the price of a room, then left. He returned shortly, explained that his car wouldn't start, and asked to borrow tools. The desk clerk gave him a screwdriver and followed him out. The clerk saw Hanson and another black man working on Bowles's car. Eventually the two gave up and returned the screwdriver and Hanson rented a room. He filled out and signed the registration card, and showed the clerk his driver's license. The clerk never saw either man again, and the car remained parked in the motel lot. Hanson and

---

1. Hanson was charged in the alternative with malice or felony murder in both counts. The jury acquitted him of malice murder on Count II.

Miller robbed a liquor store on September 3, and robbed a federal credit union on September 8. On September 9 Miller's wife made an anonymous phone call telling police that Hanson and Miller, the credit union robbers, were in the Muskogee Econolodge. Also on September 9, a patrol officer saw Bowles's car parked at the Oasis. The officer discovered Hanson had rented a room and left the car there. Law enforcement officials from various jurisdictions coordinated this information and served warrants on Miller and Hanson at the Econolodge. Miller came out immediately. Hanson stayed in the room until driven out by tear gas. While he was alone in the room Hanson hid the murder weapons and extra ammunition in the toilet tank. Hanson's fingerprint was found on the driver's seat belt latch in Bowles's car, and Miller's fingerprint was on the front passenger seat belt latch. Rashad Barnes testified that, a few days before his arrest, Hanson visited him. Hanson said they carjacked an old lady, described how Miller killed Thurman, and confessed to Bowles's murder.

## ISSUES RELATING TO
## JURY SELECTION

¶ 4 Hanson raises several issues surrounding voir dire. Propositions VI and VII, concerning jurors' views on the death penalty, have merit and contribute to the accumulation of reversible error in this case.

■■■ ¶ 5 Hanson's claims in Propositions IV and V do not require relief. In Proposition IV Hanson complains that, although his jury was allowed to take notes, the trial court failed to use the standard Oklahoma Uniform Jury Instructions (OUJI) on note-taking and the use of notes in deliberations.[2] Hanson neither requested the instructions nor failed to object to their omission. We encourage trial courts to give jurors the standard instructions where note-taking is allowed.[3] However, the trial court's instructions, taken as a whole, fairly and accurately stated the applicable law, channeling juror's discretion in their use of notes.[4] In Proposition V Hanson complains that the trial court abused its discretion in refusing to allow individual voir dire. Individual voir dire is appropriate where the record shows jurors were not candid in their responses about the death penalty, or that responses were tailored to avoid jury service.[5] The record overall does not show the majority of potential jurors were less than candid in a response merely to avoid jury service; nor does it support Hanson's claim that jurors learned economic hardship would result in excusal from service. Hanson has not shown his right to fair and impartial jurors was affected by the decision to refuse individual voir dire.[6] These propositions are denied.

■■ ¶ 6 In Proposition VI Hanson correctly claims he was denied his right to a full and fair examination of prospective jurors' views on automatic imposition of the death penalty for malice murder. The trial court granted Hanson's motion to exclude jurors who were in favor of the death penalty. However, the trial court repeatedly denied Hanson's requests to "life-qualify" the jury by asking whether jurors would automatically impose the death penalty for first degree murder. In *Morgan v. Illinois*,[7] the United States Supreme Court held that a capital defendant must be permitted on voir dire to find out whether his prospective jurors believe that

2. OUJI–CR (2nd) 1–9, 10–8A.

3. 12 O.S.2001, § 577.2.

4. *Cohee v. State*, 1997 OK CR 30, 942 P.2d 211, 213 and 214–15; *Omalza v. State*, 1995 OK CR 80, 911 P.2d 286, 303. The trial court did not abuse its discretion in telling jurors transcripts of the proceedings would not be available during deliberations. *Glaze v. State*, 1977 OK CR 206, 565 P.2d 710, 714. Hanson particularly complains that the trial court compounded the error in instruction by telling jurors to "sit there and draw pictures of us" or "be as colorful or angry or whatever sentiment you feel" in the notes.

Taken in context, this colloquial statement was intended to reassure jurors that their notes were for private use, not to encourage jurors to be distracted.

5. *Wackerly v. State*, 2000 OK CR 15, 12 P.3d 1, 8, cert. denied, 532 U.S. 1028, 121 S.Ct. 1976, 149 L.Ed.2d 768 (2001).

6. *Childress v. State*, 2000 OK CR 10, 1 P.3d 1006, 1015–16.

7. 504 U.S. 719, 735–36, 112 S.Ct. 2222, 2233, 119 L.Ed.2d 492 (1992).

the death penalty should automatically be imposed upon conviction for first degree murder. The Supreme Court reasoned that a juror who will automatically impose a death sentence cannot in good faith follow the law and consider aggravating circumstances and mitigating evidence.[8] This Court has repeatedly held that, if a defendant so requests, either he or the trial court must ask prospective jurors whether they would automatically impose a sentence of death;[9] this Court reversed and remanded one capital case twice on this very issue.[10]

¶ 7 The State admits that, upon request, a defendant must be allowed to ask whether jurors would automatically impose the death penalty. However, the State argues this requirement was satisfied by the trial court's general question as to whether jurors could consider all three punishments, along with counsels' questions about jurors' views on the death penalty. Both the United States Supreme Court and this Court have rejected this argument.[11] As we found in *Jones* II,

> The State conflates two very different lines of questioning. It is important that voir dire questions determine whether prospective jurors will consider all three punishments equally. However, asking that question will not satisfy the specific inquiry whether a juror would automatically impose a sentence of death.[12]

As the Supreme Court noted, "a juror could, in good conscience, swear to uphold the law

and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so."[13] This is illustrated in this case by Juror Fulfaro, who said he could follow the law and consider all three punishments, but then said that only the death penalty was an adequate punishment for first degree murder.

¶ 8 Hanson's jury was able to impose a sentence of life without parole for felony murder. This does not answer the question whether any sitting juror would automatically have imposed death for malice murder. The record shows that at least one sitting juror indicated by word and gesture he would support such a conclusion. We have held that it is constitutionally unacceptable for a defendant to be sentenced by a jury without knowing whether it, or members of the prospective jury panel, would automatically impose a death sentence.[14] Hanson was entitled to ask whether jurors would automatically impose death, and the trial court erred in denying him that right. In combination with other errors, this error requires remand for capital resentencing.

¶ 9 In Proposition VII Hanson argues that Juror Fulfaro should have been excused for cause. Juror Fulfaro stated he could follow the law and consider all three punishments for murder. When questioned by defense counsel, Fulfaro said he believed that defendants had their day in court but victims' rights were forgotten; said he believed in "an eye for an eye"; approved of the strict

---

8.   *Morgan*, 504 U.S. at 729, 112 S.Ct. at 2229.

9.   *McCarty v. State*, 1998 OK CR 61, 977 P.2d 1116, 1135, *cert. denied*, 528 U.S. 1009, 120 S.Ct. 509, 145 L.Ed.2d 394 (1999); *Fitzgerald v. State*, 1998 OK CR 68, 972 P.2d 1157, 1170–71 (where trial court denied *pro se* defendant's request to life-qualify jury, then sustained State's objections to defendant's questions, error in combination with others required reversal); *Cannon v. State*, 1998 OK CR 28, 961 P.2d 838, 844 (no error for trial court refusal to ask life-qualifying questions where defense counsel was allowed to pose questions); *Knighton v. State*, 1996 OK CR 2, 912 P.2d 878, 884–85, *cert. denied*, 519 U.S. 841, 117 S.Ct. 120, 136 L.Ed.2d 71; *Hammon v. State*, 1995 OK CR 33, 898 P.2d 1287, 1300 (reversal required where trial court failed to allow life-qualifying questions). *See also Wackerly v. State*, 2000 OK CR 15, 12 P.3d 1, 8, *cert. denied*, 532 U.S. 1028, 121 S.Ct. 1976, 149 L.Ed.2d 768

(2001) (reaffirming principle that jury must, on request, be asked life-qualifying questions, Court held no error in trial court's failure to remove jurors who indicated they might automatically impose death penalty).

10.   *Jones v. State*, 1999 OK CR 8, 990 P.2d 247, 250 (*Jones* II); *Jones v. State*, 1995 OK CR 34, 899 P.2d 635, 647, *cert. denied*, 517 U.S. 1122, 116 S.Ct. 1357, 134 L.Ed.2d 524 (*Jones* I).

11.   *Jones* II, 990 P.2d at 249–50; *Jones* I, 899 P.2d at 647; *Hammon*, 898 P.2d at 1300; *Morgan*, 504 U.S. at 732–34, 112 S.Ct. at 2232.

12.   *Jones* II, 990 P.2d at 249.

13.   *Morgan*, 504 U.S. at 735, 112 S.Ct. at 2233.

14.   *Jones* II, 990 P.2d at 250.

punishments found in Middle Eastern countries. He stated that life and life without parole were significant but not adequate punishments for premeditated murder, and said he would only consider death for that crime. Fulfaro explained he believed that the victim's family deserved that closure. Over defense counsel's objection, the trial court asked Fulfaro whether he could consider all three punishments and impose the one warranted by the law and the evidence. Fulfaro replied he could, because his understanding of the defense question was that, if the prosecution brought the proof of murder to him, he would be upholding the law of Oklahoma. Defense counsel correctly noted that the trial court's general question did not go to Fulfaro's likelihood to automatically impose the death penalty (see Proposition VI, discussed above). The trial court denied Hanson's request to excuse Fulfaro for cause.

¶ 10 The decision to excuse a juror for cause is within the trial court's discretion.[15] This Court will look to the whole of voir dire in determining whether a juror should be excused for cause.[16] All doubts regarding juror impartiality must be resolved in the defendant's favor.[17] A juror's views must not substantially impair or prevent the performance of his duties under his oath and the trial court's instructions.[18] The court should remove for cause any juror who will automatically vote for the death penalty, as that juror cannot fulfill his oath.[19] This bias need not be proven with unmistakable clarity.[20] This Court recently reversed where a juror indicated a strong bias towards the death penalty which persisted when he was asked whether he could fairly consider all three punishments.[21] The State distinguishes this case because Fulfaro, while stating he believed death was the only adequate punishment for premeditated murder, agreed he could consider all three punishments. However, Fulfaro was not asked whether he could *fairly* consider all three, and that single word carries an inescapable constitutional weight. Taken as a whole, the record of Fulfaro's voir dire shows that he was biased to automatically give the death penalty for premeditated murder. He should have been excused for cause.

¶ 11 In order to show he was prejudiced by this error, Hanson must show that his peremptory challenges were reduced so he was forced, over objection, to keep an unacceptable juror.[22] Trial counsel made a record asking for an additional peremptory challenge. He explained that he would have used this peremptory challenge to excuse Juror D. McNeil, who shook his head vigorously in agreement when Fulfaro explained his bias for the death penalty. The State suggests nothing in the record supports this claim, as McNeil said he could consider all three punishments after hearing the evidence. On the contrary, McNeil stated during voir dire that he believed in the death penalty because people who take a life should pay for it with theirs. Regarding the death penalty, he said, "It really don't bother me at

15. *Warner v. State*, 2001 OK CR 11, 29 P.3d 569, 572.

16. *Humphreys v. State*, 1997 OK CR 59, 947 P.2d 565, 570, *cert. denied*, 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998).

17. *Warner*, 29 P.3d at 572; *Hawkins v. State*, 1986 OK CR 58, 717 P.2d 1156, 1158.

18. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).

19. *Morgan*, 504 U.S. at 729, 112 S.Ct. at 2229.

20. *Warner*, 29 P.3d at 573. *See also Salazar v. State*, 1996 OK CR 25, 919 P.2d 1120, 1128 *cert. denied*, 528 U.S. 895, 120 S.Ct. 226, 145 L.Ed.2d 190 (1999) (holding that the trial court erred in denying defendant challenges for cause when three jurors indicated they would impose the death penalty for premeditated or intentional murder).

21. *Warner*, 29 P.3d at 573.

22. *Matthews v. State*, 2002 OK CR 16, 45 P.3d 907, 915, *cert. denied*, 537 U.S. 1074, 123 S.Ct. 665, 154 L.Ed.2d 570 (2002); *Warner*, 29 P.3d at 574; *Young v. State*, 1998 OK CR 62, 992 P.2d 332, 338, *cert. denied*, 528 U.S. 837, 120 S.Ct. 100, 145 L.Ed.2d 84 (1999); *Salazar*, 919 P.2d at 1128–29; *Johnson v. Gibson*, 254 F.3d 1155, 1159 (10th Cir.2001), *cert. denied*, 534 U.S. 1029, 122 S.Ct. 566, 151 L.Ed.2d 439. *See also United States v. Martinez–Salazar*, 528 U.S. 304, 316, 120 S.Ct. 774, 782, 145 L.Ed.2d 792 (2000) (error where use of peremptory challenge to unseat juror who should have been excused for cause results in seating of biased juror).

all. If people go out and commit crimes, with a bad nature and everything, I think they should be punished for it." McNeil also had watched as a friend was murdered in a drive-by shooting.

¶ 12 The State suggests Hanson had many opportunities to remove McNeil with a peremptory challenge.[23] This misses the point. If, as the State claims, McNeil was an acceptable juror, Hanson had no need to remove him. If, as the record shows, McNeil was potentially biased, then Hanson should have been able to use a peremptory challenge to remove him—instead of using it to remove a juror who should have been removed for cause. The State also suggests Hanson was not prejudiced since McNeil was passed for cause. This is not the standard. Hanson need only show that the juror was unacceptable because he was undesirable to his position.[24] The record supports Hanson's claim. Fulfaro should have been excused for cause, and this error prejudiced Hanson. In combination with other errors, this requires that Count I be remanded for resentencing.

## ISSUES RELATING TO FIRST STAGE PROCEEDINGS

¶ 13 Hanson raises only one claim of error specifically pertaining to the guilt/innocence stage of trial. In Proposition III he complains that prosecutorial misconduct in the first stage deprived him of his right to a fair trial.[25] He objected to several comments, preserving the error for appeal; we review the rest for plain error. Parties have wide latitude, in closing argument, to discuss the evidence and reasonable inferences from evidence, and relief is required only where grossly improper and unwarranted argument affects a defendant's rights.[26] None of the comments require relief.

¶ 14 Hanson preserved only one error during the first stage. Counsel objected twice to the prosecutors' repeated characterizations of the defense case as resembling an octopus's ink bag, and hiding from the facts. These objections were overruled, and the prosecutor continued to similarly describe Hanson's case. Prosecutors should not cast aspersions on opposing counsel or ridicule the defense. The comments to which Hanson objected were inappropriate, but do not require relief.

¶ 15 Without objection, the State called Hanson a "gun-totin', trigger-pullin' carjacker" and a "two-time, cold-blooded

23. Hanson used his first peremptory challenge on Fulfaro. His fourth challenge was used for a juror who felt strongly that murder should be taken with a death sentence. [Trial Tr. Vol. 4 589] Hanson's fifth challenge was used for a juror who first said she had a mandatory threshold above which the death penalty must be imposed, then said she would not solely impose the death penalty. [Trial Tr. Vol. 4 649–47] The State's seventh challenge was used against a juror who said the death penalty was appropriate where a life was taken. [Trial Tr. Vol. 5 848] Hanson used his seventh challenge against an African–American juror; he explained the trial court had not allowed him to question this juror about automatically imposing the death penalty but he had shaken his head in agreement with everything Fulfaro said. [Trial Tr. Vol 4 459, Vol. 5 853] Hanson's eighth challenge excused the juror who had stated he believed the entire panel was jaundiced by the voir dire process and thought counsel was not contesting Hanson's guilt. [Trial Tr. Vol. 5 864–65, 885]

24. *Thompson v. State*, 1974 OK CR 15, 519 P.2d 538, 541.

25. Our decision to remand Count I for resentencing renders Hanson's claim of prosecutorial misconduct in the second stage largely moot. Hanson complains the prosecutor engaged in name-calling, referring to Hanson as a jackal who lived a reign of terror, committing armed robbery after armed robbery and murder. While prosecutors should avoid name-calling, the comment about multiple armed robberies and murder is an accurate statement of the facts. Hanson claims the prosecutor impugned counsel's credibility by arguing that "we heard about some third party on some grassy knoll or in the bushes. It's always somebody else. It's the grandma that didn't give him attention." The first sentence, again, suggests that counsel is trying to fool the jurors. However, the remaining sentences are a proper comment on Hanson's mitigating evidence. *Malicoat v. State*, 2000 OK CR 1, 992 P.2d 383, 401–02, *cert. denied*, 531 U.S. 888, 121 S.Ct. 208, 148 L.Ed.2d 146. The record does not show these borderline statements improperly affected the jury's decision to impose life without the possibility of parole for Count II.

26. *Hooks v. State*, 2001 OK CR 1, 19 P.3d 294, 314, *cert. denied*, 534 U.S. 963, 122 S.Ct. 371, 151 L.Ed.2d 282; *Childress*, 1 P.3d at 1013.

murderer" and jackal. We look with disfavor on name-calling.[27] However, the evidence showed Hanson was a carjacker who carried a gun and committed at least one murder; this does not rise to the level of plain error. Hanson claims the prosecutor improperly vouched for Rashad Barnes's truthfulness and argued facts not in evidence concerning him. The prosecutor argued that Barnes had become a third victim in the case when he became a snitch; Barnes testified that he failed to contact police and was unhappy about testifying because he had a snitch label.[28] The prosecutor also argued Hanson was trying to accuse Barnes to save himself. This is exactly what defense counsel suggested during closing argument: that Barnes, not Hanson, committed the crimes with Miller. This was a reasonable characterization of Hanson's case.

¶ 16 The prosecutor, describing the crimes, asked rhetorically what might have happened had Bowles's car not broken down, and suggested perhaps there would be a file of dead bodies. He also stated that Miller and Hanson were jackals who traveled in packs and preyed on the weak, and said "we" pay the price. A prosecutor should not encourage jurors to let improper sympathy, sentiment or prejudice influence their decisions.[29] The prosecutor told jurors it "choked me up" to hear testimony that, after killing Thurman and Bowles and robbing the federal credit union with the same guns, the defendants bought beer. Prosecutors should refrain from expressing personal opinions.[30] The prosecutor's descriptions of Bowles accurately describe the evidence, or are within the wide latitude afforded in argument. Hanson fails to show that the prosecutor's comments were so grossly improper and unwarranted that they affected his rights, and this proposition is denied.

## ISSUES RELATING TO SECOND STAGE PROCEEDINGS

¶ 17 In Proposition I Hanson claims the trial court erred in refusing to permit his expert witness to present testimony discussing the probability of his future dangerousness, to rebut the continuing threat aggravating circumstance. Hanson argues (a) that this evidence is relevant and admissible; (b) that the trial court erred in summarily excluding the evidence without holding a hearing on its scientific reliability; and (c) that the error was not harmless. The State argues that the evidence was irrelevant so the trial court did not err in refusing to admit it. This Court does not have a sufficient record before it to determine whether Hanson correctly claims this evidence was admissible. However, given the importance of the issue, we have concluded that we must remand the case for capital resentencing.

¶ 18 Hanson filed notice in January, 2001, that he intended to present expert testimony regarding his risk of future dangerousness while incarcerated through Dr. Mark Cunningham. In February, 2001, Hanson filed a supplemental notice substituting Dr. Gilda Kessner as his expert witness in this area. The State made no objection until well into the second stage of trial, after evidence of the aggravating circumstances had been presented. At that time the State objected to Dr. Kessner's testimony. Defense counsel explained that, in addition to familiarity with the tests, clinical research, literature and analysis regarding future dangerousness in prison, Dr. Kessner had interviewed Hanson and his family, and had reviewed the records of his previous prison stays. Counsel explained Dr. Kessner would testify regarding her conclusions based on her scientific knowledge as applied to her knowledge of the defendant, and would also testify regarding the term "probability". The State claimed this evidence did not meet the standards of scientific reliability set forth in

---

27. *Malicoat*, 992 P.2d at 401; *Hammon*, 898 P.2d at 1307.

28. Hanson incorrectly claims this is vouching for a witness's credibility. Vouching occurs when a prosecutor expresses a personal belief in a witness's credibility, either through explicit assurances or by implying that other evidence, not presented to the jury, supports the witness's testimony. *Pickens v. State*, 2001 OK CR 3, 19 P.3d 866, 880, *cert. denied*, 536 U.S. 961, 122 S.Ct. 2668, 153 L.Ed.2d 842 (2002).

29. *Robinson v. State*, 1995 OK CR 25, 900 P.2d 389, 398.

30. *Malicoat*, 992 P.2d at 402.

*Daubert v. Merrell Dow Pharmaceuticals.*[31] The prosecutor vigorously argued that this evidence was "highly unreliable", claiming that "the State of Oklahoma has said certainly psychological profiling is not acceptable in the court of Oklahoma." Without reference to authority, the prosecutor stated this kind of continuing threat evidence had been held inappropriate. Without holding a hearing on scientific admissibility, or allowing further argument, the trial court summarily ruled that "the testimony of Mr. [sic] Kessner is not admissible and does not meet the *Daubert* and *Kumho Tire* test."

¶ 19 This Court has never held inadmissible evidence of a defendant's propensity for future violence, in or out of prison, to support continuing threat. Both this Court and the Supreme Court have explicitly held that psychiatric evidence is relevant on this issue.[32] Its scientific reliability has long been accepted. This Court has not held that the specific "risk assessment" evidence of future dangerousness, combining clinical results with a defendant's own history, is inadmissible. Neither this Court nor the United States Supreme Court have suggested that

**31.** 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (setting standard for reliability of scientific evidence).

**32.** *Skipper v. South Carolina,* 476 U.S. 1, 4–5, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986); *Barefoot v. Estelle,* 463 U.S. 880, 896–97, 103 S.Ct. 3383, 3396, 77 L.Ed.2d 1090 (1983); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). A defendant must be allowed to present all relevant mitigating evidence, including expert testimony if the expert's specialized knowledge will assist the jury to understand the evidence or determine a fact in issue. *Lockett v. State,* 2002 OK CR 30, 53 P.3d 418, 429, *cert. denied,* —— U.S. ——, 123 S.Ct. 1794, 155 L.Ed.2d 673 (2003); 12 O.S.2001, § 2702. Evidence of good behavior in prison is relevant to the issue of continuing threat. *Salazar v. State,* 1998 OK CR 70, 973 P.2d 315, 326, *cert. denied,* 528 U.S. 895, 120 S.Ct. 226, 145 L.Ed.2d 190 (1999) (State must avoid any argument that defendant's good prison behavior is irrelevant in a capital sentencing proceeding, and State must itself avoid improperly limiting the term "society" by telling jury that the term is not limited to any particular segment of the population); *Hain v. State,* 1996 OK CR 26, 919 P.2d 1130, 1148, *cert. denied,* 519 U.S. 1031, 117 S.Ct. 588, 136 L.Ed.2d 517 ("society" can apply to prison population, as it is defendant's attitude and actions, not number of people threatened, which determines future dangerousness); *Braun v. State,* 1995 OK CR 42, 909 P.2d 783, 798, *cert. denied,* 517 U.S. 1144, 116 S.Ct. 1438, 134 L.Ed.2d 559 (1996) ("society" includes prison population, and defendant's attitudes and actions determine future dangerousness); *Berget v. State,* 1991 OK CR 121, 824 P.2d 364, 374, *cert. denied,* 506 U.S. 841, 113 S.Ct. 124, 121 L.Ed.2d 79 (1992) (capital sentencing statute must be read broadly as relating to prison life and society at large). This Court has repeatedly upheld the State's use of psychiatric, psychological, or other testimony concerning a defendant's behavior as a predictor of his risk of future dangerousness. *See, e.g., Williams v. State,* 2001 OK CR 9, 22 P.3d 702, 720–21, *cert. denied,* 534 U.S. 1092, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002) (expert evidence of defendant's sexual fantasies and sexually explicit communications while in jail); *Moore v. State,* 1990 OK CR 5, 788 P.2d 387, 403, *cert. denied,* 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed.2d 182 (clinical psychologist testified that if released from prison the chance was good that defendant would continue to commit violent criminal acts); *Thompson v. State,* 1986 OK CR 130, 724 P.2d 780, 785 (clinical psychologist's testimony was used solely to prove the existence of a probability that defendant would commit criminal acts of violence that would constitute a continuing threat to society). We have also upheld the use of evidence describing a defendant's behavior while incarcerated in order to predict future criminal conduct. *See, e.g., Phillips v. State,* 1999 OK CR 38, 989 P.2d 1017, 1040, *cert. denied,* 531 U.S. 837, 121 S.Ct. 97, 148 L.Ed.2d 56 (2000) (testimony that while in jail defendant filled a spray bottle with urine and sprayed it on guards who were serving his food, plus family's fear of defendant and contact with local law enforcement, showed a pattern of escalating criminal activity and general disregard for the rules of society); *Thornburg v. State,* 1999 OK CR 32, 985 P.2d 1234, 1247, *cert. denied,* 529 U.S. 1113, 120 S.Ct. 1970, 146 L.Ed.2d 800 (2000) (after he was incarcerated, defendant menaced other inmates and assaulted a jailer); *Braun,* 909 P.2d at 798 (defendant assaulted a guard in the New Mexico prison system, and Kansas officials twice found homemade weapons in his jail cell); *Pennington v. State,* 1995 OK CR 79, 913 P.2d 1356, 1371, *cert. denied,* 519 U.S. 841, 117 S.Ct. 121, 136 L.Ed.2d 72 (1996) (defendant had made threats of violence while in custody). We have said that evidence of adaptability to prison life is legitimate in mitigation where the continuing threat aggravating circumstance is alleged. *Welch v. State,* 2000 OK CR 8, 2 P.3d 356, 376, *cert. denied,* 531 U.S. 1056, 121 S.Ct. 665, 148 L.Ed.2d 567 (majority of defendant's second stage defense focused on his adaptability to a structured prison environment which defense counsel vigorously argued during closing argument to rebut the State's continuing threat contention).

this evidence would be irrelevant on the issue of future dangerousness.

¶ 20 This Court recently discussed "risk assessment" evidence. In *Fitzgerald v. State* [I] [33] we had reversed and remanded a capital sentence, in part because the defendant had been prevented from presenting expert testimony to rebut the continuing threat aggravating circumstance. We determined that a capital defendant is entitled to expert assistance to rebut an allegation of continuing threat where the State presents evidence, expert or not, on future dangerousness. On remand, the defendant indicated he intended to present a psychological expert to conduct a risk assessment of his future dangerousness, but his designated expert was not allowed to testify. In *Fitzgerald v. State* [II] [34] we determined this decision was not error. We noted that, while the defendant had indicated he would use an expert to present risk assessment evidence, "nothing in either the Offer of Proof or Response indicates that Cunningham performed risk assessment on Fitzgerald or how he would testify regarding such an assessment. Thus, the trial court correctly prohibited Dr. Cunningham from testifying." As the State does in Hanson's appeal, we relied on *Hooker v. State*,[35] in which we upheld a trial court's decision to prevent a defense expert from testifying where the expert's opinions were not based on individual assessment of the subjects of her opinion. Since Fitzgerald did not present risk assessment evidence to counter the State's allegation of continuing threat, this

Court did not reach the issue of its scientific reliability.

¶ 21 Hanson argues that the trial court abused its discretion by failing to hold a *Daubert* hearing. *Daubert* held that trial courts, acting as gatekeepers, review novel expert testimony for reliability.[36] The trial court here failed to fulfill its role as a gatekeeper when it summarily concluded that risk assessment evidence would not meet the *Daubert* test. Risk assessment evidence may, as Hanson claims, be substantially identical to the well-accepted clinical psychiatric evidence of future dangerousness. It may, as the State argues, be a significantly different, novel approach to psychiatric testimony. As there was no *Daubert* hearing and the record does not sufficiently describe the proposed testimony or risk assessment method, this Court cannot evaluate this claim. We refuse any invitation to speculate regarding this evidence's admissibility.

¶ 22 The State alleged that Hanson would probably continue to commit acts of violence posing a continuing threat to society. Hanson had a constitutional right to rebut that allegation by presenting expert evidence regarding his future dangerousness. With notice to the State, Hanson offered an expert witness to testify regarding the nature of probability in this context, the scientific literature on this issue, and how that applied to Hanson himself, based on the expert's interviews with Hanson and his family and her

---

**33.** 1998 OK CR 68, 972 P.2d 1157, 1169.

**34.** 2002 OK CR 31, ¶ 10, 61 P.3d 901, *cert. denied*, — U.S. ——, 123 S.Ct. 1631, 155 L.Ed.2d 495 (2003).

**35.** 1994 OK CR 75, 887 P.2d 1351, 1367, *cert. denied*, 516 U.S. 858, 116 S.Ct. 164, 133 L.Ed.2d 106 (1995) (defense expert could not testify about effect on defendant's children of death sentence compared to life without parole, where expert had neither met nor examined the children).

**36.** 509 U.S. at 593–95, 113 S.Ct. at 2796–97. Factors for consideration include: (1) a method's falsifiability, reliability and feasibility; (2) whether the method is subject to peer review, publication, or other scrutiny by the scientific community; (3) the method's known or potential rate of error; and (4) the proposed technique's general

acceptance in the relevant scientific community. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150–51, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999), the United States Supreme Court extended the *Daubert* test to all novel expert testimony. Where the subject of expert testimony has been often used and has long been recognized as proper, the trial court need not make a determination of reliability under *Daubert*. *See, e.g., Harris v. State*, 2000 OK CR 20, 13 P.3d 489, 493, *cert denied*, 532 U.S. 1025, 121 S.Ct. 1971, 149 L.Ed.2d 764 (2001). *See also Taylor v. State*, 1995 OK CR 10, 889 P.2d 319, 327 (adopting *Daubert*, we stated Oklahoma imposes additional admissibility requirement only on novel scientific evidence, which uses an uncommon procedure or theory). This Court will not apply *Daubert* retroactively where scientific subjects have been accepted as valid. *Romano v. State*, 1995 OK CR 74, 909 P.2d 92, 112, *cert. denied*, 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996).

reviews of his prison records. Hanson could not present this witness. We are unable to determine whether this was error, but the potential error would be of constitutional magnitude. The only fair and equitable remedy is a remand for resentencing, at which time Hanson and the State will have an opportunity to present evidence regarding the scientific reliability of this testimony. This proposition is granted.[37]

¶ 23 Hanson claims in Proposition II that trial counsel was ineffective for failing to press this issue further. The record shows that the trial court would neither entertain further argument on this issue nor reconsider its ruling. We will not say counsel was ineffective for accepting the trial court's ruling and continuing with the trial.[38]

¶ 24 In Proposition XI Hanson correctly claims the trial court failed to instruct the jury to consider his proffered list of mitigating circumstances. The Oklahoma Uniform Jury Instructions, Criminal, contain a model instruction on mitigating evidence, OUJI–CR (2nd) 4–79. The Notes on Use to that Instruction state: "This list is intended to be illustrative, rather than exclusive, and *the trial court should instruct the jury on any other mitigating circumstances for which evidence has been introduced."* [39] Hanson submitted an instruction on mitigating evidence specifically listing nine mitigating circumstances, and orally asked to add a tenth circumstance.[40] Hanson's proposed mitigating circumstances were supported by evidence admitted during either the first or second stage of trial, all of which was incorporated into the second stage.[41] Although the OUJI note indicates a trial court should instruct on any mitigating circumstance supported by the evidence, the trial court refused Hanson's proposed instruction. Instead, the trial court allowed only three of the illustrative circumstances listed in OUJI–CR (2nd) 4–79, about which the trial court believed evidence had been presented—Hanson's age, character and emotional and family history. Consequently, the jury was not instructed on all the mitigating circumstances supported by the evidence.

¶ 25 This Court will not disturb a trial court's decision regarding instructions absent abuse of discretion, "as long as the instructions, taken as a whole, fairly and accurately state the applicable law." [42] The

---

37. In Proposition VIII(B) Hanson correctly claims the trial court failed to give OUJI–CR (2nd) 4–74, defining the evidence necessary to support a finding of continuing threat. This instruction should be given at resentencing.

38. *Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000); *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069–70, 80 L.Ed.2d 674, 693 (1984).

39. OUJI–CR (2nd) 4–79, Notes on Use (emphasis added).

40. (1) Defendant's emotional history; (2) Defendant's family history; (3) Defendant has a five-year-old son; (4) Defendant has never killed anyone before; (5) Defendant had no intention that Jerald Thurman be killed; (6) Co Defendant Miller was the active influence in the crimes and the Thurman murder; (7) Only Rashad Barnes provided direct evidence that Defendant ever pulled the trigger on any gun the day of the murders; (8) Life without parole is a significant punishment; (9) Miller dominated the Defendant; (10) Defendant was a follower. O.R. 295.

41. Hanson's mother and sister both testified that Hanson had a 5–year–old son and was a good father. Second stage evidence showed that, un-

like his co-defendant, Hanson had not committed murder before these crimes. First and second-stage evidence showed that co-defendant Miller, not Hanson, killed Thurman and Rashad Barnes's testimony suggested Hanson was unaware Miller was going to kill Thurman and did not intend his death; this circumstance is bolstered by the jury's finding that Thurman's death was felony murder. First and second-stage evidence, from State witnesses Rashad Barnes, Parekh, and Mendez, indicated that co-defendant Miller was an active influence in the Thurman murder and two of the additional armed robberies the two committed (as well as telling Hanson to kill Bowles). The whole of the evidence in both stages supports Hanson's claim that Rashad Barnes gave the only testimony that Hanson ever pulled the trigger on any gun the day of the murders. State witnesses Rashad Barnes, Parekh, and Mendez, as well as Hanson's mother, supported Hanson's claim that he was a follower and was dominated by Miller. Hanson's proposed circumstance, that life without parole is a significant punishment, was supported by common sense, argument, and the jury panel's answers in voir dire, but was not supported by any specific evidence at trial.

42. *Omalza v. State*, 1995 OK CR 80, 911 P.2d 286, 303.

trial court gave OUJI–CR (2nd) 4–78, which defines mitigating circumstances and notes, "The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case." This instruction was followed by OUJI–CR (2nd) 4–79, as modified by the trial court, which told jurors that information had been introduced as to the three mitigating circumstances above, and stated, "In addition, you may decide that other mitigating circumstances exist, and if so, you should consider those circumstances as well." These instructions, taken as a whole, did not fairly and accurately state the applicable law. While jurors were instructed that evidence of only three mitigating circumstances was introduced, in fact evidence had been presented supporting six other circumstances, which should have been enumerated for the jury in modified OUJI–CR (2nd) 4–79.

¶ 26 Given the qualitative difference between a death sentence and other punishments, a capital jury must be able to consider in mitigation "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."[43] Specific instructions on mitigating evidence give guidance to the jury and reduce the likelihood that a death sentence will be imposed arbitrarily, capriciously, or in a freakish manner.[44] Oklahoma allows jurors to consider any evidence they may, individually, find to be mitigating, and enumerated lists of mitigating circumstances are not exclusive.[45] However, trial courts should give an instruction, modeled after OUJI–CR (2nd) 4–79, listing mitigating circumstances supported by the evidence.[46] It is error for a trial court to refuse to give a defendant's proposed list of mitigating circumstances where the list is supported by the evidence and the evidence is the focal point of the defendant's case in mitigation.[47] Hanson's case in mitigation centered on exactly his requested circumstances: his emotional and family history, his subservience to his co-defendant, and his limited culpability in one of the murders. The trial court's failure to give the requested instruction significantly diminished Hanson's ability to fully present his mitigating evidence for the jury's consideration.[48] Hanson's jury should have received his requested instruction on mitigating evidence. Its absence prejudiced Hanson's ability to present his case in mitigation to the jury. The jury instructions on mitigation did not accurately and fairly state the applicable law. In combination with other errors, this requires reversal for resentencing on Count I.

¶ 27 Hanson correctly claims in Proposition XIII(A) that the jury heard victim impact evidence outside the scope of the capital sentencing statute. Mary Bowles's niece, Sara Mooney, gave evidence as the designated Bowles family representative. Mooney presented evidence of the impact of Bowles's death on Mooney's elderly mother, who was Bowles's sister. This was within the bounds of permissible victim impact evidence. Mooney also presented evidence of the impact of Bowles's death on herself and her extended family of cousins and their

---

43. *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978).

44. *Gregg v. Georgia*, 428 U.S. 153, 194–95, 96 S.Ct. 2909, 2935, 49 L.Ed.2d 859 (1976).

45. *Douglas v. State*, 1997 OK CR 79, 951 P.2d 651, 677–78, *cert. denied*, 525 U.S. 884, 119 S.Ct. 195, 142 L.Ed.2d 159 (1998); *Romano v. State*, 1995 OK CR 74, 909 P.2d 92, 124, *cert. denied*, 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996).

46. *Douglas*, 951 P.2d at 678.

47. *Ledbetter v. State*, 1997 OK CR 5, 933 P.2d 880, 888. In *Ledbetter*, this error combined with errors in victim impact evidence to require reversal. In *Cannon v. State*, 1998 OK CR 28, 961 P.2d 838, 853–54, we found the trial court's failure to give the defendant's requested instruction did not require relief because the mitigating circumstance at issue was not the focal point of the defendant's case in mitigation.

48. Hanson also claims this instruction created a reasonable likelihood that the jury applied the challenged instruction in a way that prevented the consideration of constitutionally relevant evidence under *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). We have previously rejected this argument, and will not revisit the issue in this case. *Cannon*, 961 P.2d at 854; *Ledbetter*, 933 P.2d at 898.

children, all of whom were Bowles's nieces and nephews, as well as on the Tulsa community. Jerald Thurman's sister, Dianne Moseby, presented evidence regarding the impact Thurman's death had, not only on her life, but on the life of her son, Thurman's nephew.

¶ 28 "Immediate family" for the purposes of victim impact evidence is defined as "the spouse, a child by birth or adoption, a stepchild, a parent, or a sibling of each victim." [49] We have held that a person not within the statutory definition of "family" may be designated a family representative, and may present otherwise admissible testimony on behalf of immediate family members.[50] However, we have not extended the statutory definition of "immediate family" to include persons related to victims in ways other than those designated by the Legislature.[51] While Mooney could properly give evidence regarding the effect of Bowles's death on her mother, the remainder of her testimony was inadmissible under the statute. Moseby's testimony regarding the impact of her brother's death on herself was within statutory limits, but her testimony regarding the effect on her son was not. Consequently, almost all of Mooney's eight-page statement, and a significant portion of Moseby's six-page statement, should not have been admitted. These statements, particularly Mooney's, focused on the emotional impact of the victims' deaths. They were emotionally affecting. This Court need not decide whether, standing alone, this inadmissible evidence created an unreasoned response in juror's minds and affected the death sentence.[52] In combination with other errors, it requires relief.[53]

¶ 29 In Proposition XV Hanson argues that the accumulation of error in this case deprived him of due process of law and a reliable sentencing proceeding. We have found separate errors in Propositions I, VI, VII, VIII, XI, and XIII. These serious errors affected the sentencing stage. Hanson was not allowed to discover whether potential jurors, including sitting jurors, would automatically impose the death penalty for malice murder. When the trial court refused to excuse just such a biased juror, Hanson used a peremptory challenge to remove him and was forced to keep an unacceptable juror on the panel. We cannot determine whether Hanson should have been allowed to present his expert witness to present "risk assessment" evidence and rebut the allegation that he would be a continuing threat to society. The jury was not instructed on the elements of the continuing threat aggravating circumstance. As a consequence, the instructions failed to properly guide the jury's discretion. The jury did not hear Hanson's requested instruction on mitigating circumstances, which were supported by the evidence and were the focus of his case in mitigation; this effectively diminished his ability to present his case in mitigation to the jury. The jury heard improper victim impact evidence. We did not find any of these errors individually harmless beyond a reasonable doubt. Their combination requires reversal and remand for capital resentencing.[54] The remainder of Hanson's second-stage propositions are moot.

LILE, V.P.J., LUMPKIN, J. and STRUBHAR, J., concur in results.

JOHNSON, P.J., concurs.

LUMPKIN, Judge: concurs in results.

¶ 1 I agree with Judge Lile's separate vote and join in his writing. In addition, I do not find the record factually supports the state-

49.  22 O.S.2001, § 984(2).

50.  *Hooks*, 19 P.3d at 313.

51.  In *Selsor*, 2 P.3d at 352, we held testimony of an unrelated, live, victim was inadmissible as victim impact evidence. We declined to grant relief for this error because the testimony was relevant and admissible to prove the charged aggravating circumstance that the defendant created a great risk of death to more than one person. Neither Mooney's nor Moseby's evidence was relevant to any charged aggravating circumstance, or to any other issue in the first or second stage of trial.

52.  *Cargle*, 909 P.2d at 829.

53.  *Fitzgerald v. State*, 1998 OK CR 68, 972 P.2d 1157, 1175.

54.  *Fitzgerald v. State*, 1998 OK CR 68, 972 P.2d 1157, 1175.

ments the Opinion makes about Juror D. McNeil.

¶ 2 Furthermore, the Opinion's statement that "Hanson need only show that the juror was unacceptable because he was undesirable to his position," supposedly supported by *Thompson v. State*, 1974 OK CR 15, 519 P.2d 538, is a misstatement of the law. *Thompson* cites to *Fennell v. State*, 1964 OK Cr 107, 396 P.2d 889 as an example of a case where the defendant did not exhaust all of his peremptory challenges " . . . and was thereby precluded from removing a prospective juror from the panel, **whom he considered to be undesirable to his position.**" *Thompson*, 519 P.2d at 541. (emphasis added.) This statement is mere dicta, is not part of *Thompson's* holding, and is therefore not the law. The actual rule of law regarding error on the challenge of a juror for cause was stated by this Court in *Patton v. State*, 1998 OK CR 66, 973 P.2d 270, 283:

> The decision whether to disqualify a prospective juror for cause rests in the trial court's sound discretion. *Allen v. State*, 862 P.2d 487, 491 (Okl.Cr.1993), *cert. denied*, 511 U.S. 1075, 114 S.Ct. 1657, 128 L.Ed.2d 375 (1994). The trial court's decision will not be overturned unless an abuse of discretion is shown. *Id.*

Here, the trial court did not abuse its discretion. Even if the challenge for cause should have been granted, Appellant has failed to demonstrate he was forced, over objection, to keep an unacceptable juror. *Warner v. State*, 2001 OK CR 11, 29 P.3d 569, 574. However, I agree the failure to allow the defense counsel's questions, designed to determine if prospective jurors would automatically impose the death penalty, deprives this Court with the record it needs to ensure, in fact, there was not an unacceptable juror remaining on the panel. The term "unacceptable" means a juror who cannot be fair and impartial.

¶ 3 I also disagree with some of the syntax in the discussion of proposition one. The Opinion states, "This Court does not have a sufficient record before us to determine whether Hanson correctly claims this evidence was admissible." From there, the Opinion goes on to discuss the test for admissibility of scientific evidence without pointing out it is the Appellant's duty to provide a sufficient record for this Court to review. If the trial court denies testimony of a witness or admission of an exhibit, it is the responsibility of the party offering the testimony or evidence to ensure a sufficient record is made to allow this Court to review the issue on appeal. This can be accomplished by requesting and conducting an *in camera* hearing to present the evidence for the record or through an offer of proof of sufficient specificity to provide this Court with what it needs in order to review the claim of error.

¶ 4 Furthermore, such evidence or testimony must be specifically applicable to the defendant on trial, not general statistics applicable to some larger, amorphous group of people who are not on trial. Here, the record is void of how the proposed evidence relates directly to Appellant or is applicable to his individualized sentence. *See, e.g., Fitzgerald v. State*, 2002 OK CR 31, 61 P.3d 901, 904–05 (expert correctly prohibited from testifying because risk assessment was not performed on defendant); *Hooker v. State*, 1994 OK CR 75, 887 P.2d 1351, 1367 (defense expert properly prohibited from testifying to opinions not individualized to the defendant or his crime). I cannot agree error exists in the failure to hold a *Daubert/Kumho* hearing, where Appellant failed to establish the relevancy of his proffered witness's testimony to the Court.

¶ 5 Additionally, I disagree with the Opinion's statement in Proposition XI, concerning the failure of the Court to specifically list proposed mitigating factors, that "consequently, the jury was not instructed on all the mitigating circumstances supported by the evidence." It is not automatic error when a judge fails to specifically list every possible mitigating factor, even those supported by the evidence. That is why we have OUJI–CR (2d) 4–79.[1] Jurors are not limited in their consideration of mitigation factors to

---

1. This point is made clear in the notes on use to OUJI–CR (2d) 4–79, which says the trial judge "should" instruct in the jury on any other mitigating circumstances for which evidence has been introduced. Obviously, this decision will be discretionary, as different trial judge's would

only those specifically listed. As triers of fact, they determine what is and what is not mitigating, regardless of whether or not it is listed. Defense counsel is free to argue any and all of the evidence presented as mitigating, but the jury is ultimately free to decide the issue. Here, any error in the trial judge's list of mitigating factors was not an abuse of discretion and was, in my opinion, harmless.

LILE, Vice Presiding Judge: concurs in results.

¶1 Clearly, the trial court should have allowed defense counsel's questions designed to determine which, if any, prospective jurors would automatically impose the death sentence for intentional murder. *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492. This error requires re-sentencing. However, the legal analysis concerning prospective juror Fulfaro and juror McNeil is flawed. *Frederick v. State,* 2001 OK CR 34, 37 P.3d 908; *Ross v.Oklahoma,* 1986 OK CR 49, 717 P.2d 117; *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

surely have differences of opinion regarding what is or what is not mitigating. Furthermore, several mitigating ideas may be combined into one broad statement or separated into very specific statements. The point is that the judge's decision on mitigating evidence is discretionary and should be reviewed only for an abuse of discretion.