2006 OK CR 46

**Bigler Jobe STOUFFER, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D 2003–277.**

Court of Criminal Appeals of Oklahoma.

Nov. 14, 2006.

*2006 Revisions To The Oklahoma Uniform Jury Instructions–Criminal (Second Edition),* 2006 OK CR 26, —— P.3d ——, OUJI–CR 2d 10–13B.

Gary James, Richard Anderson, Oklahoma City, OK, attorneys for defendant at trial.

Richard Wintory, Assistant District Attorney, Christy Reid, Assistant District Attorney, Oklahoma County, Oklahoma City, OK, Attorneys for the State at trial.

Mark L. Henricksen, El Reno, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer J. Dickson, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

### OPINION

LEWIS, Judge.

¶ 1 Appellant, Bigler Jobe Stouffer, was charged with the First Degree (malice) Murder in violation of 21 O.S.1981, § 701.7(A), and Shooting with Intent to Kill in violation of 21 O.S.1981, § 642, on January 29, 1985, in Oklahoma County District Court Case No. CRF–85–509. The instant appeal arises from a trial occurring in January and February of 2003, before the Honorable Jerry Bass, District Judge.[1] The State filed a Bill of Particulars and alleged, during sentencing, the existence of three aggravating circumstances: (1) that the appellant knowingly created a great risk of death to more than one person; (2) that the killing was committed for the purpose of preventing a lawful arrest or prosecution; and (3) the existence of the probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society.

1. In his first trial, Stouffer was convicted on both counts and the jury found the existence of three aggravating circumstances. The jury found (1) that the killing was especially heinous, atrocious, and cruel; (2) that the appellant knowingly created a great risk of death to more than one person; and (3) that the killing was committed for the purpose of preventing a lawful arrest or prosecution.

On direct appeal, the convictions and sentences were affirmed; however, on rehearing, the finding of the aggravating circumstance of heinous, atrocious and cruel was reversed; yet, the penalty of death was allowed to stand. *See Stouffer v. State,* 1987 OK CR 92, 738 P.2d 1349, *modified on rehearing in Stouffer v. State,* 1987 OK CR 166, 742 P.2d 562, *cert denied,* 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988).

Stouffer subsequently sought *habeas corpus* relief in the federal courts. The United States District Court for the Western District of Oklahoma ultimately granted Stouffer's writ of habeas corpus and ordered that Stouffer be granted a new trial, which was affirmed by the 10th Circuit Court of Appeals. *See Stouffer v. Reynolds,* 214 F.3d 1231 (10th Cir.2000).

¶ 2 The jury found Stouffer guilty of first degree (malice) murder and shooting with intent to kill. Stouffer was sentenced to life imprisonment for shooting with intent to kill. The jury found the existence of two aggravating circumstances and set punishment at death for the crime of first-degree murder.[2] Judge Bass formally sentenced Stouffer in accordance with the jury verdict on June 3, 2003.

## I. FACTS

¶ 3 Doug Ivens and Velva Ivens (now Pardee) were separated and pursuing divorce proceedings. B.J. (Bud) Stouffer was dating Velva. Doug Ivens was dating Linda Reaves.

¶ 4 Doug Ivens testified that on January 24, 1985, Stouffer came to his house asking for a pistol. Stouffer told him that he needed a gun because there were prowlers or a burglar at Velva Ivens's house. Doug Ivens was concerned for the safety of his estranged wife and his two eight-year-old daughters.

¶ 5 Doug Ivens went to his bedroom and came out with a bank bag containing a loaded Colt .357 caliber revolver. Doug gave the bank bag to Stouffer. Stouffer turned his back to Doug Ivens, and then he turned around with the pistol in his hand. Stouffer fired two shots at Ivens, and Ivens fell to the floor. Stouffer then went to where Linda Reaves was reclining on the couch and shot her twice in the head. Stouffer walked back to Ivens and fired another shot into Ivens's face. Stouffer then left.

¶ 6 Ivens was able to crawl to the phone and call the police. He told police that Bud Stouffer had shot him and Linda Reaves. Reaves died as a result of her gunshot wounds, but Doug Ivens survived.

¶ 7 The State's experts concluded that five shots were fired. Five spent rounds and one live round were found in the Colt Python revolver.

¶ 8 The defense experts testified that there was not enough information to conclude that only five shots were fired. They concluded that more shots could have been fired. These experts pointed out that it was impossible to match all of the slugs to the Colt Python. The shots could have been fired from any .357 caliber weapon (including a .38 revolver or a 9 millimeter pistol). All of the defense experts believed that the crime scene was insufficiently processed, possibly because the police focused only on the description of events relayed by Ivens.

¶ 9 Stouffer raises eighteen propositions of error in his appeal. These issues will be addressed as they arose at trial.

## II. JUDICIAL BIAS CLAIM

¶ 10 We will initially dispose of Stouffer's overarching claim of judicial bias raised in proposition nine. We recognize that every defendant is entitled to an impartial judge. *Tumey v. Ohio*, 273 U.S. 510, 533, 47 S.Ct. 437, 445, 71 L.Ed. 749 (1927). When a defendant shows that a judge is not impartial, reversal is automatic—a defendant need not show prejudice. *Chapman v. California*, 386 U.S. 18, 24 and fn. 8, 87 S.Ct. 824, 828 and fn. 8, 17 L.Ed.2d 705 (1967). Stouffer cites to nothing contained in the record to support his claim. We find that Judge Bass was not biased against Stouffer.[3]

## III. JURY SELECTION ISSUES

### A.

¶ 11 In proposition eight, Stouffer raises several claims regarding jury *voir dire*. We review the manner and extent of a trial court's *voir dire* under an abuse of

---

2. The jury found that (1) the appellant knowingly created a great risk of death to more than one person; and (2) that the killing was committed for the purpose of preventing a lawful arrest or prosecution. The jury did not find the existence of the probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society.

3. Stouffer attempts to prove his claim by attaching affidavits from two witnesses who overheard Judge Bass tell Stouffer "If I hear another complaint out of you, I will send you back to McAllister [sic]." He requests an evidentiary hearing on this matter. These statements do not show judicial bias, judicial frustration possibly, but no bias. This proposition has no merit and no evidentiary hearing is required.

discretion standard. *Littlejohn v. State*, 2004 OK CR 6, ¶ 49, 85 P.3d 287, 301. This Court will not reverse unless an abuse of discretion is shown.

¶ 12 Stouffer first attacks the jury selection process by taking issue with the trial court's refusal to *voir dire* jurors individually. Stouffer cites to several instances where he claims the failure to have individual *voir dire* tainted the entire jury pool. Although a defendant may request individual *voir dire*, he has no automatic right to such a request. "Individual *voir dire* is appropriate where the record shows jurors were not candid in their responses about the death penalty, or that responses were tailored to avoid jury service." *Hanson v. State*, 2003 OK CR 12, ¶ 5, 72 P.3d 40, 46.

¶ 13 There is no evidence here that the potential jurors were anything but candid in their answers to the trial court's questioning. Thus, the trial court did not abuse its discretion in failing to hold individual *voir dire*. Stouffer's claims of jury taint are discussed below as they meld with other complaints Stouffer raises regarding jury selection.

¶ 14 Stouffer next claims that the trial court's *voir dire* method deprived him of the right to "life qualify" the jury. The trial court first began *voir dire* by explaining that there were two groups—those that would never vote for the death penalty and those that would always vote for the death penalty. The trial court instructed jurors who believed they fit in either of those categories to indicate by holding up their hands. The court then questioned people who raised their hands.

¶ 15 In *Hanson*, 2003 OK CR 12, ¶ 6, 72 P.3d at 46–47, this Court criticized a trial court because it refused to allow the defendant to "life qualify" jurors. In that case we cited *Morgan v. Illinois*, 504 U.S. 719, 735–36, 112 S.Ct. 2222, 2233, 119 L.Ed.2d 492 (1992), where the United States Supreme Court held that a capital defendant must be permitted on *voir dire* to find out whether his prospective jurors believe that the death penalty should automatically be imposed upon conviction for first degree murder.

¶ 16 In this case, Stouffer was allowed to ask whether jurors believed that everyone who is convicted of first-degree murder should receive the death penalty. Two jurors indicated that they would automatically vote for the death penalty and not consider lesser forms of punishment. They were both excused for cause. Therefore, he was allowed to "life qualify" the jury and this portion of his proposition is baseless.

¶ 17 Stouffer next identifies two jurors and complains that he was not allowed to rehabilitate them after they stated that they could not impose the death penalty. We have discussed this issue in the past holding that it is not an abuse of discretion to deny counsel an opportunity to rehabilitate a potential juror if the trial court has sufficiently questioned the juror to make an informed decision. *Littlejohn*, 2004 OK CR 6, ¶ 49, 85 P.3d 287 at 301. The trial court is not required to allow the parties to rehabilitate potential jurors. *Duvall v. State*, 1991 OK CR 64, ¶ 25, 825 P.2d 621, 631.

¶ 18 When a juror is disqualified, we review a trial court's decision for an abuse of discretion. *Black v. State*, 2001 OK CR 5, ¶ 25, 21 P.3d 1047, 1060. When a juror's views on capital punishment would "prevent or substantially impair the performance of his duties," removal for cause is proper. *Williams v. State*, 2001 OK CR 9, ¶ 10, 22 P.3d 702, 709.

¶ 19 On the second day of jury selection, two jurors indicated that they could not, upon reflection, impose the death penalty, or give "meaningful consideration" to all three punishment options. Defense counsel asked to rehabilitate both of these jurors because on day one, they stated that they could consider all three punishment options. Stouffer claims that after the first juror spoke up, the second juror was prompted to do the same. He claims that the discussion with both jurors tainted the entire pool.

¶ 20 The first juror asked the trial court, "If we're having second thoughts about something you asked us about yesterday specifically regarding the death penalty, when is the time to talk about it?" The trial court

allowed him to speak and the juror stated, "I can't do it." Further inquiry revealed that this juror was in the "never" group.

¶ 21 The trial court reminded this juror that the law requires that meaningful consideration be given to all three alternative penalties provided for by law. The juror remained unequivocal that he would not follow the law on this point. At a bench conference, the State asked to have this juror excused; defense counsel asked to *voir dire* the juror. The trial court found that this juror had reflected upon it overnight and had stated, without hesitation, that he would not follow the law, and the trial court excused the juror.

¶ 22 The second juror told the court that she too, upon overnight reflection, could not impose the death penalty. The colloquy between this juror and the trial court was similar to that above, and this juror was removed, as well. We find that the trial court's examination of these jurors was sufficient to determine that they should be excused for cause. Thus, there was no abuse of discretion in not allowing defense counsel to try to rehabilitate the jurors.

¶ 23 Stouffer's claim that the colloquy between these two jurors and the trial court tainted the entire pool is unavailing. To support this claim, he identifies a third juror who also had thought about the penalty overnight and said that they were struggling with the death penalty. This came up as the prosecutor was questioning jurors. The juror simply indicated a moral dilemma with the killing aspect of the death penalty. The prosecutor inquired whether jurors felt that a legally imposed death penalty was killing. This juror replied, "no." We fail to see the connection between this discussion and the discussion above, other than to highlight the fact that these jurors were conscientious about their duty.

■■■ ¶ 24 Stouffer turns this issue into an attack on the prosecutor by claiming that the prosecutor impermissibly told the jury that they had a duty to impose the death penalty. Actually, the prosecutor explained that the jury's duty is to impose punishment. Then four pages later, as pointed out by Stouffer, the prosecutor again mentioned the juror's

role. However, Stouffer quotes only part of the "speech." The prosecutor stated,

> If you reach the point in the case where you have found the defendant guilty beyond a reasonable doubt of Murder in the First Degree, you found one or more aggravating circumstances, you found that those aggravating circumstances outweigh the mitigating circumstances and that after you have given meaningful consideration to all three punishments you find—you find that the appropriate penalty is death, okay, do each of you all feel that you could look across the room—we're not looking for jurors in this case, on this evidence, this day, looking at their feet ashamed, feeling like they are doing a bad thing or a morally reprehensible thing. If you reach that point do you feel like you can, knowing you're doing your duty, just as if you had a reasonable doubt your duty would be to turn him loose, but knowing that you're doing your duty proudly as an Oklahoman, as an American, look across the courtroom and impose the death penalty.... Do each of you feel you could do that?

(Vol.II, Tr. 114–15) There was absolutely no objection to this "question." Therefore, any error must rise to the level of plain error.

¶ 25 This inquiry was used to determine whether the jury could set aside their feelings and impose the death penalty if the facts and law were such that the penalty was appropriate. The prosecutor's argument here assumes that the jurors have already decided that the death penalty is appropriate and is inquiring whether they can take the next step and actually impose the penalty. This inquiry did not rise to the level of plain error.

¶ 26 In *Romano v. State*, 1993 OK CR 8, ¶¶ 97–99, 847 P.2d 368, 390, the trial judge advised each prospective juror during *voir dire* that it was his or her duty to determine whether or not, considering the evidence, death should be recommended. This Court held such a statement was not error as it was a proper statement of the law. In fact, this inquiry reinforced to the jury their "awesome responsibility."

■■■ ¶ 27 Stouffer next argues that he was prejudiced when a potential juror stated

that Stouffer had to be a little bit guilty or he would not be sitting here. Another one stated that there had to be enough evidence for an indictment. These answers came during defense counsel's *voir dire*, and he did not move to have the jury instructed at that point.

¶ 28 Stouffer has not shown that these comments tainted the entire jury. Defense counsel was asking about the presumption of innocence. The authority cited by Stouffer, not in his brief in chief, but in his reply brief simply reaffirms the presumption of innocence, which was outlined by the trial court in the instructions to the jury. There is no indication that the jury was biased toward Stouffer. *See Ross v. State*, 1986 OK CR 49, ¶ 11, 717 P.2d 117, 120, *aff'd sub nom Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) (a defendant must show that the jury sitting in the trial was biased).

■■■ ¶ 29 Next, Stouffer complains that the trial court removed a juror for cause, over objection. Stouffer claims that this juror should not have been dismissed and discussions between this juror and the trial court and the prosecutor about reasonable doubt tainted the entire jury panel.

¶ 30 The discussion about reasonable doubt compared "beyond a shadow of a doubt" with reasonable doubt. The record reflects that this discussion took place individually and not in front of the entire venire. At that time, the prosecution asked the court to have this juror removed for cause because the juror would hold the State to a burden higher than reasonable doubt. This juror specifically stated that she would have to have no doubt. The trial court removed her for cause over objection.

¶ 31 The trial court did not abuse its discretion, based on the *in camera* examination and the juror's statement. It was clear that this juror would hold the State to a higher

burden than reasonable doubt. We have held that a prosecutor can tell a jury that "beyond a reasonable doubt" does not mean beyond all doubt or beyond any doubt. *Phillips v. State*, 1999 OK CR 38, ¶ 22, 989 P.2d 1017, 1028. When it is discovered that a juror will not follow the law and will hold the State to the higher burden, the juror should be excused for cause.

■■■ ¶ 32 Next, Stouffer complains about the prosecutor's term "central casting." It appears that the prosecutor was trying to determine whether the jurors could decide punishment based on the evidence and not on Stouffer's appearance in the courtroom. He was trying to determine whether they could impose the death penalty on someone sitting right there in front of them. Again, there was no objection.

¶ 33 As we stated in *Ledbetter v. State*, 1997 OK CR 5, ¶ 73, 933 P.2d 880, 900,

> Reading the questioning as a whole, it is obvious the prosecutor was stressing to the jury that they were not engaged in a theoretical discussion about some abstract concept or person, but rather were talking about the particular person in front of them, and considering an issue that "is as serious as it gets." We find no error here. [Citations omitted]

¶ 34 It must be noted, that at the penalty phase of this trial, "the trial court administered explicit instructions concerning the jury's duty to determine punishment. . . . Accordingly, we find the question did not divert the jury from its 'awesome responsibility' of deciding the appropriate punishment." *See Humphreys v. State*, 1997 OK CR 59, ¶ 5, 947 P.2d 565, 570. We find that the jury's decision was properly channeled by the trial court's instructions and not by these comments during *voir dire*. *See Bland v. State*, 2000 OK CR 11, ¶ 96, 4 P.3d 702, 727–28.[4]

---

4. "The prosecutor focused on the jury's duty to serve and render a verdict based upon the evidence. The comments did not suggest that the jury's only moral course was to impose the death penalty. . . . Further, we have previously found no error in the prosecutor's acknowledging to the jury the difficulty of their task and asking them seriously to consider the punishment options available. . . . The comments here are not equivalent to those in other cases which we have held to be improper and prejudicial as playing on societal alarm or as inflaming the passions or prejudices of the jury. . . . The comments focused on the duty of the jurors to serve and render a verdict based upon the evidence. It did not convey the message that they must find the Appellant guilty based on emotional reaction." [Citations omitted]

¶ 35 Stouffer next claims that the prosecution attempted to evoke sympathy for the victim when it told jurors that the victim, "Linda Reaves will not make an appearance in this case. She won't take the witness stand." The prosecutor also stated, "Now, this case has to be decided on evidence, not emotion."

¶ 36 There was no objection to these comments. The comments were made after a juror indicated that he might consider the interests of the family. There is no indication that this isolated commented prejudiced Stouffer in any way.

■ ¶ 37 Next, Stouffer claims that the trial court erred in failing to excuse certain jurors for cause. The trial court's method of striking jurors is relevant here. In this case, the trial court filled the panel with jurors who had been passed for cause (probably around thirty-three in this case), they were numbered in sequential order, with juror numbers one through twelve comprising the initial pre-strike jury. When the first juror (out of the initial twelve) was struck with a peremptory strike, number thirteen stepped in and so on. After all of the peremptory strikes were done, two alternates were chosen from the remaining jurors (five in this case).

¶ 38 Stouffer's claim regarding some of these jurors is not supported by the record. Two jurors had the same last name and only one sat on the jury. Stouffer does not claim that the one left on the jury should have been removed for cause.[5] Stouffer mentions two other jurors,[6] but does not cite to the record where his allegations are supported.[7] Counsel for Stouffer waived his ninth peremptory challenge, because he knew which potential juror was next in line.[8] Counsel

challenged and asked that all three jurors (T. Knight, Vetter and Shetley) be excused for cause.

¶ 39 In this situation, where defense counsel knows who is going to be next and he does not have enough peremptory challenges to remove all of the unacceptable jurors, counsel is placed in quite a quandary. However, at least counsel knew who he would get if he exercised his last peremptory challenge and he could make an informed decision. Counsel did ask for more peremptory challenges, but that request was denied.

¶ 40 None of these three jurors should have been removed for cause, they were not statutorily prohibited from serving, all stated they would follow the law, and the trial court did not abuse its discretion in failing to remove them. There is no indication in this case, that the jury was biased against Stouffer. Thus, this proposition must fail.

## IV. FIRST STAGE ISSUES

### A.

¶ 41 Stouffer claims, in proposition thirteen, that he was prevented from presenting his theory of defense during opening statement. He also claims, in this proposition that certain rulings by the trial court caused him to choose against his right to testify in his defense.

■ ¶ 42 Regarding the opening statement issue, the trial court has the discretion to limit the opening statement; this Court will not reverse unless we find an abuse of that discretion. *Bernay v. State*, 1999 OK CR 37, ¶ 61, 989 P.2d 998, 1014.

■ ¶ 43 Stouffer wanted to present a theory that the shooting of Doug Ivens was

---

5. Stouffer claims that the trial court should have excused juror "Knight." However, Stouffer does not cite to the record where "Knight" was examined for cause. There was a juror, D. Knight, who sat on the jury. Stouffer cited to some of his comments on earlier pages of his brief, but not here. There were two jurors named Knight, as pointed out by the trial court. (See Vol. III, Tr. 127). D. Knight and T. Knight were left as possible alternate jurors. T. Knight was excused and D. Knight eventually served on the jury.

6. Shetley and Vetter both of whom had relatives in law enforcement.

7. This Court was able to glean from the record that defense counsel moved to excuse Shetley, Vetter and T. Knight for cause. Only Vetter remained on the jury.

8. Next in line was T. Knight (who had relatives murdered), so counsel was forced to choose between keeping Shetley or Vetter or striking one of them and getting T. Knight.

self-defense, and trial counsel made an offer of proof to the trial court regarding his theory. The offer of proof was that Linda Reaves was a part-time secretary for Phil Blair (Velva Ivens's brother). Phil Blair and Doug Ivens had joined in some business ventures. Apparently, Blair was charged with embezzling money ($900,000) from Doug Ivens and a preliminary hearing was set to start on the Monday following this murder.

¶ 44 Reaves was scheduled to be a witness at this hearing. Stouffer's theory is that someone shot Reaves before he got there, and he shot Doug Ivens in self-defense. It was his contention that someone else had a motive to kill Reaves other than Stouffer. Under Stouffer's theory, Reaves would have been shot just moments before Stouffer arrived, because Reaves still had agonal breathing when the first officers arrived 5–10 minutes after the shooting.

¶ 45 Stouffer argued that the State's theory that Stouffer shot Ivens and Reaves so he could get his hands on Doug Ivens's money through Velva was invalid because Stouffer knew that Doug Ivens's money had been embezzled away. Stouffer did not mention the large life insurance policy, which at one time named Velva Ivens as beneficiary.

¶ 46 We note that during opening statement, Stouffer's trial counsel did state that Stouffer arrived at Ivens's house and Ivens was agitated. Stouffer thought Ivens had a gun in his waistband. Stouffer asked to borrow a gun because he feared Ivens. Ivens gave Stouffer a gun and the two began struggling with each other, and Ivens was shot during the struggle. Therefore, he was able to present his side of the story during opening. However, Stouffer wanted to outline a theory involving a third party perpetrator defense.

¶ 47 The third party perpetrator defense was discussed at length, in *Gore v. State,* 2005 OK CR 14, 119 P.3d 1268. More recently in *Holmes v. South Carolina,* 547 U.S. ——, 126 S.Ct. 1727, 164 L.Ed.2d 503 (May 1, 2006), the United States Supreme Court took up the issue of third party perpetrator defense.

¶ 48 The United States Supreme Court acknowledged that State lawmakers have broad latitude to establish rules excluding evidence from criminal trials, which is limited by a defendant's right to a meaningful opportunity to present a complete defense. *Holmes,* 547 U.S. at ——, 126 S.Ct. at 1731. The Court also identified the power of trial courts to exclude evidence under the rules of evidence "when the evidence has only a very weak logical connection to the central issue." The Supreme Court held that both the State's evidence and a defendant's evidence (including attacks on the State's evidence) must be evaluated in determining the admissibility of a defendant's proffered "third party perpetrator" evidence.

¶ 49 We discussed, at length, in *Gore* the admissibility of third party perpetrator evidence. We stated that,

"There must be evidence of acts or circumstances that tend clearly to point to another, rather than to the defendant, as the guilty party," ... "there must be such proof of connection with it, such a train of facts or circumstances, as tend clearly to point out some one besides the prisoner as the guilty party. Remote acts, disconnected, and outside of the crime itself, cannot be separately proved for such a purpose" ..., and "there must be evidence of acts or circumstances that tend clearly to point to another, rather than the accused." Accordingly, proof of an overt act in the commission of the crime is required, but it is as a threshold showing, and not as the sole determining factor. It is only one of the factors to consider in determining if the evidence sufficiently connects the third party to the crime.

As our test for determining the admissibility of third party perpetrator evidence is based upon more than the single finding of an overt act in the commission of the crime, the standard is not too strict and is consistent with constitutional principles. It does not prevent the defendant from presenting a defense or presenting evidence that another person may have committed the crime as long as there is some quantum of evidence, which is more than mere suspicion and innuendo, that con-

nects the third party to the commission of the crime. It does not directly control the scope of defense counsel's argument to the jury and counsel is allowed to argue any inference that can be fairly drawn from the evidence.

*Gore,* 2005 OK CR 14, ¶¶ 23–24, 119 P.3d at 1276. [s omitted]

¶ 50 The facts of this case are quite different from those of *Holmes* and *Gore.* In both *Holmes* and *Gore,* the third party perpetrators were named, and evidence tied them specifically to the crime. Here, the theory that Stouffer wanted to present was based purely on speculation, suspicion and innuendo. He had no evidence of an overt act by any particular person pointing to an alternative suspect. Furthermore, victim Doug Ivens's identification of Stouffer was concrete and was never impeached. Ivens had no reason to name Stouffer over anyone who was involved in the scheme to embezzle 900,-000 dollars from him. Stouffer's only plausible third party perpetrator is Ivens himself, a theory that might have been explored during Ivens's cross-examination. Indeed, defense counsel asked Ivens if he struggled with Stouffer, and Ivens denied that there was a struggle, but the examination went no further.

¶ 51 Stouffer claims that other evidence, not introduced at trial, lends credence to the third party perpetrator theory. This evidence includes calls to police about suspicious activity in the area on the night of the murder, and conflicting evidence about whether the Colt Python was the single murder weapon and the fact that two other pistols were found in the home. The Colt Python had been fired, no doubt. The other two pistols were kept in a walk in closet, where they had always been stored. Common sense and the circumstances of this case indicate that these pistols were not used. This extraneous evidence is purely speculative regarding an unknown third party. Based on what was presented in the record, the trial court did not abuse its discretion in limiting the opening statement.

¶ 52 Stouffer claims that he would have testified, in order to present his theory of the case, but the trial court's rulings caused him to choose against his right to testify. The trial court ruled, after an *in camera* hearing, that the State would not be allowed to present evidence that Stouffer had attempted to hire two people (the Blackstones) to assassinate Doug Ivens, Ron Shotts, and Beau Cantrell (Stouffer's first trial attorney) sometime after his first trial and before he was granted a new trial. The prosecutor admitted that this evidence was hearsay upon hearsay or "double hearsay." The prosecutor would have called Richard Rojem (a death row inmate) to testify as to why Stouffer wanted the men dead.

¶ 53 The trial court ruled that evidence that Stouffer attempted to have Ivens killed was admissible as evidence of consciousness of guilt; however, evidence that he tried to have others killed would be inadmissible. This evidence would have been admissible whether or not Stouffer testified. He stated that he would rule on the hearsay aspects of the testimony as they came up during the trial. The State never presented any of this evidence, until second stage.[9]

¶ 54 Stouffer has shown no reason why this ruling caused him not to testify. This evidence was not presented at trial. There was no ruling, which stated that if Stouffer testified, all of this evidence would be admissible. Stouffer's choice not to testify was a strategic choice based on a totally of the circumstances. He was not forced to choose against his right to testify. *See LaFevers v. State,* 1995 OK CR 26, ¶ 34, 897 P.2d 292, 307.

**B.**

¶ 55 In proposition three, Stouffer claims that constitutional error occurred when the State was allowed to introduce, over objection, Bill McCormack's testimony regarding a fight between him and Stouffer, which occurred at a hospital while they were visiting a hospitalized Velva Ivens. Stouffer also

---

9. Blackstone did testify during the second stage about this conspiracy to commit murder, but Stouffer did not complain about this evidence.

complains about the reference to this and other "other crimes" evidence during the State's opening statement.

¶ 56 In the fall of 1984, Velva Ivens was admitted to Deaconess Hospital for surgery. Before this, she had dated McCormack. While Ivens was at the Hospital, McCormack came to Velva's room with some flowers. He was startled to see Stouffer lying on a cot in the room.

¶ 57 A few minutes later, Velva's parents came into the room and McCormack said he would leave; however, Velva asked him to stay. McCormack went out into the hallway where he was confronted by Velva's father, Howard Blair, who told McCormack to leave. McCormack and Blair argued and Stouffer came out of the room and started beating on McCormack.

¶ 58 Stouffer hit McCormack several times knocking him down and into a stairwell. McCormack suffered a cut to his forehead and two broken ribs because of the attack.

¶ 59 The State filed a *Burks* notice regarding evidence of a fight between Bill McCormack and Stouffer on January 2, 2003. Trial proceedings began on January 13, 2003. The State argued at trial, and now on appeal, that the evidence was admissible as evidence that Stouffer was lying when he named McCormack as a possible suspect and the evidence was admissible to show that Stouffer was trying to "isolate" Velva Ivens from others.

¶ 60 The admission of this evidence, as with all evidence, is reviewed under an abuse of discretion standard. The introduction of evidence is left to the sound discretion of the trial court; the decision will not be disturbed absent an abuse of that discretion. *Pickens v. State*, 2001 OK CR 3, ¶ 21, 19 P.3d 866, 876. An abuse of discretion is "a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented." *C.L.F. v. State*, 1999 OK CR 12, ¶ 5, 989 P.2d 945, 946.

¶ 61 Evidence that a defendant committed other crimes is admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. 12 O.S.2001, § 2404(B); *Lott v. State*, 2004 OK CR 27, ¶ 40, 98 P.3d 318, 334.

There must be a showing by the State that the evidence of other crimes is necessary to support the State's burden of proof.... Such evidence should not be admitted where it is a subterfuge for showing to the jury that the defendant is a person who deserves to be punished.

*Burks v. State*, 1979 OK CR 10, ¶ 15, 594 P.2d 771, 775; *See Lott*, 2004 OK CR 27, ¶ 40, 98 P.3d at 334 ("evidence of the other crime(s) must be necessary to support the State's burden of proof"). Stouffer named McCormack as a possible suspect when he learned that there was a living witness. This evidence did show the relationship between Stouffer and McCormack and it shows why Stouffer would name him as a suspect.

¶ 62 The trial court ruled that the evidence was admissible to prove plan, scheme, design and motive. Stouffer argues that the evidence is inadmissible character evidence.

¶ 63 Although relevant, the other crimes evidence may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury...." 12 O.S.Supp.2005, § 2403. Here, the introduction of this evidence is based on slim reasoning. The theory that Stouffer was out to get everyone involved in Velva Ivens's life is a very thin argument. Even so, this type of evidence reflects Stouffer's character and not a motive or common scheme.

¶ 64 Stouffer was not on trial for beating McCormack. It is difficult to understand how Stouffer's prior assault on McCormack was relevant to his motive or intent in shooting Ivens or Reaves. *See Stewart v. State*, 1988 OK CR 108, 757 P.2d 388, 395. Here, this evidence had little relevance and what little relevance it did have was substantially outweighed by the danger of unfair prejudice. Furthermore, the State has not shown that the evidence was necessary to its burden of proof.

¶ 65 The State also argues that even if the admission of this evidence constituted error, the admission was harmless beyond a reasonable doubt. In his reply brief, Stouffer tries to argue that the evidence was not

harmless because Velva Ivens had been haunted by her previous testimony.

¶ 66 At trial, Velva Ivens testified that she was haunted because in 1988 Stouffer called her and said that he never told her that he left Linda for dead. She became uncertain and did not want her earlier testimony to be false, but after listening to the tapes of her statement, she determined that her testimony was truthful.

¶ 67 We find, beyond a reasonable doubt, that this evidence did not influence the outcome of this trial. *See Sattayarak v. State,* 1994 OK CR 64, ¶ 12, 887 P.2d 1326, 1332 (the admission of inadmissible other crimes evidence may be harmless). The improper introduction of this evidence did not influence the jury's determination of Stouffer's guilt. Evidence of his guilt was overwhelming. He left a living eyewitness, whose testimony was not impeached. His testimony was corroborated by the physical evidence, the State's experts in crime scene reconstruction, and the medical examiner. Furthermore, the jury was properly instructed that this evidence could not be used as proof of guilt for the charged offenses. This evidence did not influence the jury's finding of guilt.

¶ 68 Neither did the evidence affect the sentence. This evidence would have been admissible during second stage sentencing; therefore, Stouffer cannot claim that its admission affected the sentence.

### C.

■ ¶ 69 In proposition two, Stouffer claims that inadmissible hearsay was improperly introduced against him. Here, Stouffer attacks the introduction of Velva Ivens's video taped conversation with Detective Horn. The trial court ruled that the tape was admissible because defense counsel had inferred that Velva Ivens was under the influence of drugs and that she was pressured by the police into making the statements. The trial court did not abuse its discretion in allowing the tape.

¶ 70 Stouffer argues in this proposition and in proposition one that the tape amounted to testimony because it was "testimonial evidence" as defined in *Crawford v. Washing-*

*ton,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), Stouffer's reliance on *Crawford* is misplaced for several reasons. First, *Crawford* does not apply when the declarant testifies.

Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. *See California v. Green,* 399 U.S. 149, 162, [90 S.Ct. 1930, 1937, 26 L.Ed.2d 489] (1970). It is therefore irrelevant that the reliability of some out-of-court statements "cannot be replicated, even if the declarant testifies to the same matters in court." *Post,* at 1377 (quoting *United States v. Inadi,* 475 U.S. 387, 395, [106 S.Ct. 1121, 1126, 89 L.Ed.2d 390] (1986)). The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.

*Crawford,* 541 U.S. at 59, fn. 9, 124 S.Ct. at 1369, fn. 9. Here, the declarant appeared at trial, testified, and was subject to cross-examination.

¶ 71 In addition, *Crawford* does not bar the use of testimonial statements for the purposes other than establishing the truth of the matter asserted. *Id., citing Tennessee v. Street,* 471 U.S. 409, 414, 105 S.Ct. 2078, 2081–82, 85 L.Ed.2d 425 (1985). Here, the tape was introduced, not for the truth of the matter asserted, but to show that Velva Ivens was not under the influence of drugs nor that she was pressured by the police into giving the statement implicating Stouffer. Therefore, the admissibility of the tape as an exhibit was proper.

¶ 72 Stouffer also attacks testimony from Bob Horn about statements Velva Ivens made, letters Velva Ivens received from Doug Ivens's friends and family, and the search for gloves allegedly worn by Stouffer at the time of the crime.

■ ¶ 73 Ivens's statements were introduced through the tape recording and her own testimony. Horn's testimony about Ivens's statements was introduced to show that Ivens was not under the influence of painkillers or under stress or under pressure by

police. *See Huckaby v. State,* 1990 OK CR 84, ¶ 16, 804 P.2d 447, 451 (Statement introduced to rebut defendant's innuendos of recent fabrication and improper influence). There was no abuse of discretion in the admission of this testimony.

¶ 74 Regarding the letters Ivens received; there was no objection to this testimony, so we review for plain error only. *Lott,* 2004 OK CR 27, 98 P.3d at 343. Plain error has "been defined as an error which goes to the foundation of the case, or which takes from a defendant a right essential to his defense." *Simpson v. State,* 1994 OK CR 40, ¶ 23, 876 P.2d 690, 698.

¶ 75 The testimony was first introduced to show that Velva Ivens and the friends of Doug Ivens were not on speaking terms, so the only way that she could have heard the story was from Stouffer. In fact, the friends believed Velva was involved or knew Stouffer planned to kill Doug Ivens. Stouffer is attempting to tie the two pieces of hearsay together and claiming that the evidence was improper bolstering. This is simply not the case. There is no plain error here.

¶ 76 Next, Stouffer complains about hearsay surrounding the search for the gloves. Horn testified that he was told that Stouffer was wearing gloves at the time of the crime, but he did not have gloves at booking. Horn used this information and conducted a search for the gloves. The information was introduced merely to show why Horn searched for gloves—not for the truth of the matter asserted. Furthermore, there was no objection to this testimony. There was no plain error.

### D.

¶ 77 In proposition four, Stouffer claims that improper testimony violated his constitutional rights to a fair trial and sentencing. Stouffer complains here about specific improper testimony of three separate witnesses presented by the State. The complaint centers on experts giving opinions outside their expertise and improper bolstering of their testimony.

¶ 78 First, Stouffer complains about the testimony of Police Lieutenant Pacheco. He complains that he testified about blood spatter, even though he was not a blood spatter expert. He specifically complains about Pacheco's testimony describing spatter as either high-velocity or medium-velocity blood spatter. Stouffer did not preserve this issue at trial, thus we review for plain error. *See* 12 O.S.2001, § 2104, *Simpson,* 1994 OK CR 40, ¶ 23, 876 P.2d at 698–99.

¶ 79 There is no plain error here. Detective Pacheco's expertise was not challenged; therefore, there is no record to determine whether Pacheco was a blood spatter expert. He did testify that he had been to blood spatter school; thus, it is possible that he could identify the difference between high-velocity and medium-velocity blood spatter. Pacheco did not testify about blood pattern analysis or any other analysis concerning the blood spatter.

¶ 80 Nevertheless, expert testimony was properly introduced through Tom Bevel, who testified about the nature of blood spatters and made opinions about the spatters in re-constructing the crime as it occurred. Therefore, the jury was made aware of this blood evidence and any comments made by Pacheco did not add credibility or weight to Bevel's highly technical testimony.

¶ 81 Next, Stouffer complains about the testimony of Roy Golightly the State's firearms and tool-mark expert. Golightly was a witness in this case, but he could not remember his involvement in the case. Therefore, he was unavailable for purposes of the admission of the transcript.

¶ 82 A witness is unavailable if he; (1) is exempt on the ground of privilege; (2) persists in refusing to testify despite an order of the court; (3) testifies to a lack of memory; (4) has died or is physically or mentally infirm; or (5) if his attendance cannot be procured. 12 O.S.2001, § 2804(A). The unavailability must not be due to an act of the proponent of the statement for the purpose of preventing the witness from attending or testifying. *Id.*

¶ 83 Initially, Stouffer complains about Golightly testifying from his transcript

of testimony from the prior trial. His complaint here is that the prior testimony was not tested by effective cross-examination, because he was hindered by ineffective assistance during the prior proceeding.

¶ 84 Actual cross-examination is not required, only the opportunity to cross-examine. Stouffer's complaint about adequate cross-examination is unpersuasive.

> The exception does not require the appellant to have actually conducted a cross-examination; instead, it only requires that he be given an opportunity to question the witness.... By requiring an opportunity to cross-examine, 12 O.S.1981, § 2804 affords protection to the appellant's constitutional right to confront witnesses. [Citations omitted]

*Honeycutt v. State*, 1988 OK CR 76, ¶ 10, 754 P.2d 557, 560.

¶ 85 The United States Supreme Court has held that, when a defendant is provided an opportunity to cross examine the witness and avails himself of that opportunity at a prior hearing, the confrontation clause is satisfied and a transcript of the prior hearing is admissible. *Crawford v. Washington*, 541 U.S. at 68, 124 S.Ct. at 1374. We have held that this procedure is proper. *See Howell v. State*, 1994 OK CR 62, ¶ 18, 882 P.2d 1086, 1091.

¶ 86 Stouffer claims that the lack of memory made it impossible for him to effectively cross-examine Golightly. The record reveals a different story. Counsel was able to thoroughly examine Golightly, and Golightly had no trouble answering the questions posed to him on cross-examination. He did not claim a lack of memory at any point in order to avoid defense counsel's cross-examination.

¶ 87 He next complains that Golightly gave his opinion about possible bullet trajectories even though he was not an expert in the field. The State, at the direction of the Court, made it clear that Golightly was not an expert in the field of bullet trajectories. His role was to determine if the sequence of events was consistent with the five bullets

being fired from the Colt Python revolver recovered from the scene. His expertise was with firearms. His testimony was admissible and the weight to give his testimony was a matter for the jury, based on his expertise or lack thereof.

¶ 88 The third witness Stouffer complains about is Tom Bevel—the State's expert on crime scene reconstruction and bloodstain pattern analysis. Stouffer complains that testimony about "staging" was inadmissible under *Daubert* and *Kumho*.[10]

¶ 89 This Court has previously recognized Bevel's expertise in the field of blood spatter analysis and crime scene reconstruction. *Slaughter v. State*, 1997 OK CR 78, ¶ 120, 950 P.2d 839, 871; *Romano*, 1995 OK CR 74, ¶ 22, 909 P.2d 92, 110; *Robedeaux v. State*, 1993 OK CR 57, ¶ 22, 866 P.2d 417, 425; *Farris v. State*, 1983 OK CR 141, ¶ 8, 670 P.2d 995, 997–98. Therefore, Stouffer's proposition, as it relates to Bevel's expertise in crime scene reconstruction has no merit.

¶ 90 Staging, as explained by Bevel, are actions taken by a person that are meant to disrupt or alter the crime scene so that the scene is made to look different and to throw investigators off of the true track. This is all a part of crime-scene reconstruction. *See Gore*, 2005 OK CR 14, ¶ 8, 119 P.3d at 1271. Crime-scene reconstruction experts must determine whether the things occurred naturally or whether the events were staged.

¶ 91 Stouffer also complains about the prosecutor's use of specific prior cases to show Bevel's level of experience and expertise (namely the Slaughter case). Every time this strategy was used and defense counsel raised an objection, the objection was sustained. Where a trial court sustains an objection and no request is made to have the jury admonished, we review for plain error only. *Dickens v. State*, 2005 OK CR 4, ¶ 10, 106 P.3d 599, 601.

¶ 92 The record reveals the following:

**10.** *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150–51, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999).

Q. [by Wintory] Okay. I want to ask you then, sir your specific experience, do you specifically in cases that you have personally participated in the investigation of— and certainly two, three in particular, I want to direct your attention to that you've investigated for purposes of staging. The one we mentioned before, the *Jimmy Ray Slaughter* case. The other one we mentioned, *Larry Corbin High* and *Rocky Eugene Dodd.* Have you personally had experience—

Mr. James: Which we would object.

Court: Sustained

¶ 93 The trial court had previously ruled that specific examples of staging from earlier cases were prohibited. The prosecutor at that time specifically asked Bevel about the *Slaughter* case, "the crime scene where Melody and Jessica Weurtz were murdered on July 2, 1991, in Edmond, Oklahoma. Is that a case you had a chance to analyze?" This questioning did not rise to the level of plain error.

■■■■ ¶ 94 However, this type of questioning is more akin to prosecutorial misconduct because the comparison or mention, by specific name, of prior, especially high profile cases as the *Slaughter* case, is extremely improper and irrelevant. Because guilt in this case is overwhelming, the misconduct did not affect the outcome of this trial.

### E.

¶ 95 In proposition six, Stouffer claims that items of evidence and testimony were admitted even though the relevance was substantially outweighed by the danger of unfair prejudice. He starts the argument improperly stating the general law on the admission of evidence (he states that "Even if evidence is deemed relevant, its probative value must outweigh is prejudicial impact."). The true test is that relevant evidence is admissible unless its probative value is *substantially outweighed* by the danger of unfair prejudice. 12 O.S.Supp.2002, § 2403 (emphasis added).

¶ 96 First, Stouffer complains about testimony from Dana Wheat, who described her relationship with her sister, the victim Linda Reaves. Stouffer complains about the references from the prosecutor and Wheat regarding Wheat and Reaves' parents being deceased. There was no objection to this questioning, limiting our review to a review for plain error only. A page earlier the prosecutor asked Wheat if she had relatives in Oklahoma, and Wheat said that they were deceased. The complained of testimony was as follows:

Q. And the time that you spent growing up—you said both your mom and dad are dead?

A. Yes.

Q. Did they live here in Oklahoma all their lives?

A. Yes they did.

¶ 97 The prosecutor went on to elicit information that Reaves was Wheat's only sibling. Again, there was no objection. Then the prosecutor asked about circumstances in 1985, which revealed that Wheat and her husband were living with Reaves, and they all were sharing expenses in a three-bedroom home in Yukon to make ends meet "and we loved each other." Again, there was no objection.

■■■■ ¶ 98 The prosecutor continued by asking about Reaves relationship with Doug Ivens, which started as a being very good friends. Defense Counsel objected. The trial court ruled that the information was admissible after the prosecution argued that an inference had been made that Ivens may have been responsible for the murder of Reaves. This ruling was not erroneous.

¶ 99 Stouffer cites to no cases where similar or comparable questioning has been held to be inadmissible. His argument is not supported by authority, other than the general rules of evidence cited in his introduction to this proposition.

■■■■ ¶ 100 Evidence that Wheat had no living relatives (during second stage it was revealed that Wheat and Reaves's father could not attend Reaves's funeral as he was ill), as well as the testimony regarding their "loving" relationship was irrelevant to the first stage of these proceedings. However,

the testimony did not rise to level of plain error.

¶ 101 Stouffer also complains that Wheat was allowed to identify the "in life" photograph (State's exhibit 61) of Reaves and it was introduced over objection. The legislature has seen fit to make the admission of a photograph of the victim while alive relevant in a homicide case "to show the general appearance and condition of the victim while alive." 21 O.S.Supp.2002, § 2403. The "in life" photograph here was not too prejudicial to be excluded. Thus, this argument fails.

¶ 102 Stouffer next complains about the introduction of a photograph of Ivens's wounds taken just before trial. Four photographs were introduced as State's exhibit number 82. One of these photographs shows an extensive scar, which extends from just above the chest and extends below the belt line. Ivens indicated that the last surgery was because of the injuries he sustained at the hand of Stouffer. This scar was not the work of the defendant, but was the work of a surgeon some fifteen years after the crime.

¶ 103 The prosecutor asked "And to be clear, the large scar that we see from your midline, from stem to stern, that was part of the surgery, that's not a gunshot wound?" Ivens answers "No, sir, that was actually two different surgeries."

¶ 104 The relevance of this photograph is negligible because it shows the handiwork of a surgeon rather than the defendant. Here the probative value is substantially outweighed by the danger of unfair prejudice. *See Brown v. State*, 1998 OK CR 77, ¶ 91, 989 P.2d 913, 934; *see also Garrison v. State*, 2004 OK CR 35, ¶¶ 89–92, 103 P.3d 590, 607 (discussing autopsy "Y" incision). However, standing alone, the erroneous admission of this photo did not render Appellant's trial unfair.

¶ 105 He also complains about Doug Ivens's testimony regarding his wounds. Ivens testified about the location of the wounds. The prosecutor asked him to stand and point out the locations of the wounds. This aided the jury in understanding the nature of the shooting, the sequence of events, and the intent to kill element. There is no error here.

¶ 106 Stouffer also quotes questions regarding whether Ivens did not like Stouffer and whether he thought that by giving Stouffer the loaded pistol he was placing himself and Reaves in danger. The questioning regarding Ivens state of mind when he handed Stouffer the pistol was in direct response to Stouffer's opening statement where he implied that Ivens was fearful of Stouffer. This was not improper.

¶ 107 Next, Stouffer complains about the introduction of State's exhibit 92, a post-mortem photograph and the cross examination of Dr. DiMaio regarding this photograph. Stouffer also complains about State's exhibit 93, another post-mortem photograph introduced during the testimony of Dr. Chai Choi.

¶ 108 "Whether to introduce photographs of a homicide victim is a decision largely within the trial court's discretion and this decision will not be disturbed absent an abuse of discretion." *Lockett v. State*, 2002 OK CR 30, ¶ 19, 53 P.3d 418, 425.

¶ 109 "The only consideration to be made is whether the pictures are unnecessarily hideous, such that the impact on the jury can be said to be unfair." *Van White v. State*, 1999 OK CR 10, ¶ 78, 990 P.2d 253, 273, *quoting McCormick v. State*, 1993 OK CR 6, ¶ 12, 845 P.2d 896, 898. "This Court has consistently held the test for admissibility of a photograph is not whether it is gruesome or inflammatory, but whether its probative value is substantially outweighed by the danger of unfair prejudice." *Bernay*, 1999 OK CR 37, ¶ 18, 989 P.2d at 1007.

¶ 110 While Stouffer categorizes these photographs as post-autopsy photographs, the record reflects that these photographs were taken after the injury site had been cleaned of blood and matter, but before the actual autopsy. These photographs are extremely gruesome, due to the nature of the injuries sustained to Reaves. Her brain is lying exposed in both of the photographs. One photograph depicts Reaves from the waist up showing the extreme injury to her

head and the bullet entry wound above her right breast. The second is from another angle, showing her severe head injury. Both of these photographs were taken as Reaves is lying on the autopsy table.

¶ 111 The photographs evoke a visceral response. They are photographs of a young healthy woman with her brains literally blown out of her head. These types of photographs have been held admissible in the past because gruesome crimes result in gruesome photographs. *See Anderson v. State,* 1999 OK CR 44, ¶¶ 38–39, 992 P.2d 409, 421 (photographs of a victims charred remains held admissible).

It is well established that "photographs of murder victims can be probative in many respects.... They can show the nature, extent and location of wounds, establish the corpus delicti, corroborate testimony of medical examiners and expert witnesses and depict the crime scene."

*Anderson,* 1999 OK CR 44, ¶ 39, 992 P.2d at 421, *quoting, Smallwood v. State,* 1995 OK CR 60, ¶ 33, 907 P.2d 217, 228.

¶ 112 These were the first photographs taken of Reaves's injuries. They aided the first responders in explaining what they saw at the scene. The first responders testified that these injuries were the ones they saw at the scene. These photographs showed the nature, extent and location of the wounds, established the corpus delicti, and aided the testimony of expert witnesses. The probative value was not substantially outweighed by the danger of unfair prejudice; therefore, the trial court did not abuse its discretion in allowing the photographs.

¶ 113 These photographs are disturbing and even gruesome. However, they depict the handiwork of Bigler Stouffer, not the "work of a medical examiner, as an autopsy photograph might, or the effect of the natural decomposition process, as in cases where a body is discovered long after the actual killing." *See DeRosa v. State,* 2004 OK CR 19, ¶ 73, 89 P.3d 1124, 1150.

¶ 114 Stouffer complains next about the introduction of the taped phone call to the police by Doug Ivens, and the transcription of that conversation. He complains that

the tape recording was overly cumulative. Admissible evidence may become inadmissible when the probative value is substantially outweighed by the danger of needless presentation of cumulative evidence. 12 O.S.Supp.2002, § 2403. Stouffer does not claim that the tape was inadmissible only that the probative value was substantially outweighed by the dangers.

¶ 115 We held that the tape was admissible under the excited utterance exception when we decided *Stouffer v. State [Stouffer I],* 1987 OK CR 92, ¶ 32, 738 P.2d 1349, 1357. This Court has also held, in *Al–Mosawi v. State,* 1996 OK CR 59, ¶ 56, 929 P.2d 270, 283–284, that a 911 tape was admissible as part of the business record exception to hearsay evidence. *See* 12 O.S.2001, § 2803(6).

¶ 116 This Court, in *Al–Mosawi* also reasoned the tape might have been cumulative, but it did not amount to reversible error. In *Al–Mosawi,* the defendant complained that the tape bolstered the testimony of a State's witness.

¶ 117 Here the tape was probative because the victim named the shooter during the conversation stating that "Bud Stouffer shot me and one other person and I'm dying." The caller, Ivens, identified the weapon used and other things related to the crime. The tape was closer in time to the crime than the trial testimony, thereby, making it more reliable than the testimony had after the passage of time. Even though Ivens testified to these same things during trial, the probative value of the tape was not substantially outweighed by the danger of needless presentation of cumulative evidence. The tape showed his level of excitement and tended to rebut any inference that he was concocting a story to frame Stouffer. The tape was admissible; the trial court did not abuse its discretion.

¶ 118 With regard to the transcription of the recording, the trial court advised the jury that the transcript was an aid to the jury only. The transcript was used as a demonstrative aid only and it did not go to the jury during deliberations. There is no claim that the transcription is not accurate. Stouffer cites no cases, which hold that the

use of a transcription such as this is improper. There is no error here.[11]

¶ 119 Lastly, Stouffer complains about errors regarding alleged blood spots on items of evidence. Stouffer complains that Officers Mitchell and Pacheco's testimony indicating they believed there were blood spots on Stouffer's shirt and jacket was error. The officers testified that they took Stouffer's shirt after they questioned him because they saw spots, which might have been blood. Stouffer states that the prosecution knew that the spots were not blood; however, the prosecutor stated, during a "*Jackson v. Denno*[12] hearing" that the testing could neither confirm nor exclude the possibility that the spots were blood.

¶ 120 Stouffer objected to Mitchell testifying that he thought the spots were blood during a hearing conducted before Mitchell's testimony. However, during Mitchell's testimony Stouffer did not object. Counsel even stated that he had no objection to the introduction of the shirt.

¶ 121 Stouffer never objected to the testimony of Pacheco when he gave his opinion that the spots were blood, even when Pacheco testified that he believed the spots were blood and not BBQ sauce. This testimony was clearly not scientific evidence but was opinion evidence based on the officer's training and experience.

¶ 122 He also complains about forensic chemist Megan Clement's testimony regarding the spots. She testified that a presumptive test on the spots showed negative results. She testified that the results did not mean that the spots could not be blood. She

testified that the only thing conclusive that she could say that the spots were "discolorations."

¶ 123 Part of the defense was the lack of blood on Stouffer's jacket, shirt, hands, etc. The State showed that there were spots on the shirt and jacket and that Stouffer might have been wearing gloves. The "spot" evidence was relevant to allow the jury to know that there might have been blood, but science could not confirm or exclude that possibility. The jury could come to their conclusions and give the evidence the proper weight. This evidence was admissible.

### F.

¶ 124 Stouffer claims that impermissible references to his prior trial violated his constitutional rights. Stouffer notes that witness Tom Bevel referred to the "appellate record." Counsel requested a mistrial after resting its case and cites to that record for this proposition. He also complains about Bevel's testimony that presumptive tests on a shirt were positive for blood.

¶ 125 Stouffer does not cite to the specific spot in the record where this alleged error occurred, he only cites to where he moved for a mistrial based on the testimony, so he has waived this issue for review.

¶ 126 It is well established this Court will not search the record to support the appellant's unsupported assignments of error, nor review allegations of error, which are not supported by legal authority. Rule 3.5, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2006),[13]

---

11. In *Ullery v. State*, 1999 OK CR 36, ¶ 26, 988 P.2d 332, 345, this Court held that the use of transcriptions as aids to the jury during deliberations did not amount to error.

12. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

13. A. Brief of the Appellant. The brief of the appellant shall be in substantial compliance with the form and organization as follows: . . .
 (5) An argument, containing the contentions of the appellant, which sets forth all assignments of error, supported by citations to the authorities, statutes and parts of the record. Failure to list an issue pursuant to these requirements constitutes waiver of alleged

error. (*See Armstrong v. State*, 811 P.2d 593, 599 (Okl.Cr.1991)); . . .
 C. Argument and Citation of Authorities.
 (1) Both parties must provide a brief argument, exhibiting a clear statement of the point of law or fact to be discussed, with a reference to the pages of the record filed and the authorities relied upon in support of each point raised. . . .
 (6) Failure to present relevant authority in compliance with these requirements will result in the issue being forfeited on appeal. *See Stafford v. State*, 800 P.2d 738, 741 (Okl. Cr.1990); *Walton v. State*, 744 P.2d 977, 979 (Okl.Cr.1987); *S.R.S. v. State*, 728 P.2d 515, 518 (Okl.Cr.1986).

*see also Phillips v. State,* 1999 OK CR 38, fn. 6, 989 P.2d 1017, 1036, fn. 6.

¶ 127 Apparently, Stouffer is referring to the cross-examination of Bevel where he was asked what he had reviewed prior to testimony. Bevel said that he had reviewed an opinion of an appeals court and 1985 transcripts. This incident was not met with an objection.

¶ 128 These comments did not reduce the jury's sense of responsibility in this case. *See Caldwell v. Mississippi,* 472 U.S. 320, 328–329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231, 239 (1985) (If a capital jury's sense of responsibility is reduced a defendant has not received a fair trial).

## G.

¶ 129 In proposition one, Stouffer claims that he was denied his right to be present during a critical stage of trial. The "right to be present during 'critical stages'" is a right rooted in a defendant's Sixth Amendment right to confront the witnesses against him. *Dodd v. State,* 2004 OK CR 31, ¶ 20, 100 P.3d 1017, 1027. The right to due process may also be implicated, if a defendant's absence from some portion of the proceedings is shown to have impaired his ability to defend himself. *Id., citing United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985). Here, Stouffer has not shown that he was absent during a "critical stage."

¶ 130 During jury deliberations, the jury, via a note to the judge, asked to listen to the tape of Velva Ivens's interview with police. The tape had been introduced as evidence during the first stage of trial over the objection of defense counsel. We held above that the tape was admissible as an exhibit.

¶ 131 The trial court allowed the jury to listen to the tape. A record was made indicating that the trial court ruled that this was not a critical stage, which required the presence of the defendant. The ruling was predicated on the fact that the tape was an exhibit and not testimony.

The proper use of video and audiotapes by the jury during deliberations has been fashioned by this Court over the course of several decisions. A bright line emerges from these decisions: taped *testimony* may not go with the jury into deliberations; taped *exhibits* may. [citations omitted]

*Davis v. State,* 1994 OK CR 72, ¶ 17, 885 P.2d 665, 669.

¶ 132 It is clear from the record, that this tape would have gone to the jury during deliberations absent the fact that a redacted copy of the tape was not available. The jurors' access to the tapes was not a violation of Stouffer's rights. Stouffer did not have the right to be present during the time that the tape was played for the jury, as this was part of jury deliberations.

## H.

¶ 133 In part of proposition eight, Stouffer raises issues surrounding questions from the jury. The jury sent out two questions that are at issue here. One question was, "Is a juror allowed to deliberate that *continues* to deliberate on the evidence and speculation that has *not* been presented? Isn't this against the Instructions to the jury as outlined in: # 1, # 2, # 6, # 7, & # 15?" (Emphasis in original) The second question was, "We have one juror who will not follow the law and reason through the evidence! She is making up evidence, or her own theories, and will not listen to the rest of us. Is there anything that I can do or say to her?"

¶ 134 The trial court answered both of these questions at the same time by saying, "Please consider only the evidence that has been admitted during trial and please read the jury instructions carefully. You should not consider any matter of fact or of law except what has been given to you while this Court is or has been in session."

¶ 135 Defense counsel objected to the answer, stating that the answer limited the juror's thought process, but Stouffer now cites no law in support of his argument that the answer was not proper. The trial court rejected defense counsel's suggestions because it did not wish to give anything resembling an "Allen" charge at that time. This answer was consistent with the instructions given to the jury. There is no error here.

## V. SECOND STAGE ISSUES

### A.

¶ 136 Stouffer argues, in proposition seventeen that his death sentence should be reversed because the State failed to charge the aggravating circumstances in an indictment or Information and he was not provided a preliminary hearing on the aggravating circumstances, which deprived the District Court of the power to impose the death penalty.

¶ 137 Stouffer does not support this proposition with argument or analysis. He only cites *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (and relevant authority cited therein) without analyzing the applicability of *Ring* to this case. Therefore, he has waived this issue for review. Moreover, were we to review this claim, we would find that this Court has previously rejected these claims and there is no reason to revisit the issue. *Davis v. State*, 2004 OK CR 36, ¶ 46, 103 P.3d 70, 83.

### B.

¶ 138 In proposition twelve, Stouffer argues that his death sentence must be vacated because the "great risk of death to more than one person" aggravating circumstance is unconstitutional, because it does not perform the requisite narrowing function. He further claims that the evidence was insufficient to support this aggravating circumstance.

¶ 139 Here, Stouffer claims that the mere fact that there are multiple victims does not support this aggravating circumstance. Our language from *Dodd v. State*, 2004 OK CR 31, ¶¶ 106–107, 100 P.3d 1017, 1047–48, applies here:

The evidence showed that the victims were killed in the same manner, at the same place, and at essentially the same time, presenting a classic example of the "great risk of death" aggravating circumstance. *See McElmurry v. State*, 2002 OK CR 40, ¶ 106, 60 P.3d 4, 28, and numerous cases cited therein. . . .

Appellant also complains that the "great risk of death" aggravating circumstance is invalid because it does not effectively narrow the field of intentional murders eligible for the death penalty. Appellant claims this aggravating circumstance results in "automatic death eligibility" whenever more than one person is murdered at the same time and place. So it does. The fault in Appellant's argument, of course, is that he is comparing one subclass of intentional murders with itself. The real issue is whether the aggravating circumstance results in "automatic" death-sentence eligibility in every first-degree murder case. Obviously, not all intentional murders are committed in circumstances which pose a great risk of death to more than one person. This aggravating circumstance narrows death-sentence eligibility to particular conditions not inherent in every case, which is all it is constitutionally required to do. *See Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750 (1994); *McElmurry*, 2002 OK CR 40, ¶ 104, 60 P.3d at 27.

Stouffer's proposition here has no merit; neither does his claim that the evidence was insufficient to support this aggravating circumstance.

¶ 140 "When the sufficiency of the evidence for an aggravating circumstance is challenged on appeal, this Court reviews the evidence in the light most favorable to the State, to determine whether any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt." *DeRosa*, 2004 OK CR 19, ¶ 85, 89 P.3d at 1153. Both Ivens and Reaves were shot with the same weapon, at the same place, and at essentially the same time. The evidence supports this aggravating circumstance.

### C.

¶ 141 In proposition fourteen, Stouffer argues that the "murder committed for the purpose of avoiding or prevent a lawful arrest or prosecution" was not supported by the evidence. In order to support the "avoid or prevent arrest" aggravating circumstance there must be a predicate crime, separate from the murder, for which the defendant seeks to avoid arrest or prosecution. *Lott*, 2004 OK CR 27, ¶ 116, 98 P.3d.

at 348. A defendant's intent at the time of the killing is critical. *Id.*

¶ 142 In this case, the jury could have believed, beyond a reasonable doubt, that Stouffer killed Reaves so that there would be no witnesses to the shooting of Ivens. The evidence supporting this aggravating circumstance was sufficient.

## VI. VICTIM IMPACT EVIDENCE

¶ 143 Stouffer claims, in proposition eleven, that the trial court erred in admitting portions of Dana Wheat's victim-impact testimony, because it went beyond proper bounds. There were no contemporaneous objections to any of the testimony during the time Wheat was testifying, so we review the specific statements complained of here for plain error only.

¶ 144 Dana Wheat testified that her father was in the hospital, heavily sedated, recovering from open-heart surgery, and could not attend the funeral of Linda Reaves. They were afraid to tell Linda Reaves' father about what happened because of his condition. The family had the funeral director make an audio recording of the funeral so her father could hear it.

¶ 145 The testimony complained about centers around the funeral and the emotions and logistics of the funeral. She testified about planning the funeral and how she started calling people and they showed up and took over. These girls, sorority sisters and church friends, planned everything.

¶ 146 Some of the specific testimony, in part, was as follows:

Q. You did have to play a part in deciding whether the casket was open or closed? . . .

A. Well, the funeral home told us that she was beautiful. We—most of her friends wanted to say goodbye to her . . . . so we opened the—had the casket opened. And when I got down to see her she was appalling. She couldn't be viewed. I just had the casket closed and a picture put on top. She was not recognizable as my sister. . . .

When I think of my sister I always think of that scene. That was my last scene of her.

Q. The way she had been left?

A. The way she looked in that coffin.

Q. . . . . at the time of the funeral and the period after the funeral, did you and the other members of your family receive some things from these kids [Reaves school students]—

A. Yes.

Q.—that had an impact on you and the members of the immediate family?

A. Well, after the kids found out about what had happened, they all got together as a class and wrote letters to us and drew pictures and sent them back to our house in a big envelope and they were real touching. They were beautiful.

Q. You made a note here that Linda's chance of helping the development of any more children ended with her murder.

A. Well, when I had to go to the school and help the new teacher box up all of her personal things . . . they had an Indian presentation. One of her kids was Indian and the mother had brought a ceremonial shawl as part of their demonstration and gave it to Linda. It was one of those handmade shawls. . . .

They were going to set a memorial in the library in her name.

(Second Stage Tr. at 442–456)

¶ 147 Oklahoma's desire to allow victims of violent crimes some type of influence in the sentencing of criminal defendants has led to different statutes. 22 O.S.2001, §§ 984 and 984.1 allow the use of "victim impact statements" and 21 O.S.2001, § 701.10(C) allows the use of "victim impact evidence."

¶ 148 Title 21 O.S.2001, § 701.10(C) pertains only to capital sentencing proceedings. The State may present "victim impact evidence" about the victim and the impact of the murder on the family of the victim. The clear language of section 701.10(C) limits the type of victim impact evidence allowable in a capital sentencing procedure. This section is not as encompassing as 22 O.S.2001, §§ 984 and 984.1. Section 984 reads in part:

"Victim impact statements" means information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence; . . .

Section 984.1 states that,

Each victim, or members of the immediate family of each victim or person designated by the victim or by family members of the victim, may present a written victim impact statement or appear personally at the sentencing proceeding and present the statements orally. Provided, however, if a victim or any member of the immediate family or person designated by the victim or by family members of a victim wishes to appear personally, such person shall have the absolute right to do so.

22 O.S.2001, § 984.1(A).

¶ 149 This Court has stated that both "victim impact statements" and "victim impact evidence" are admissible in a capital sentencing procedure. This includes a victim's rendition of the "circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence." *See* 22 O.S.2001, § 984, *Dodd*, 2004 OK CR 31, ¶ 95, 100 P.3d at 1044.

¶ 150 However, evidence may be introduced that "is so unduly prejudicial that it renders the trial fundamentally unfair" thus implicating the Due Process Clause of the Fourteenth Amendment. *Lott*, 2004 OK CR 27, ¶ 109, 98 P.3d at 346, *quoting Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991).

¶ 151 The comments here were highly charged and they did not fall within the guidelines of our victim impact statutes. However, it is clear that this evidence did not

have a prejudicial effect on the outcome of this case.

¶ 152 Stouffer also claims that the victim impact statute is unconstitutional, because, he claims the statute is overbroad and the statute lacks the necessary safeguards against injection of passion and prejudice into the sentencing proceedings. We have rejected this claim several times. *Young v. State*, 2000 OK CR 17, ¶¶ 81–87, 12 P.3d 20, 43–44. Stouffer has raised no new authority which would cause this Court to change its position on this issue.

## VII. PROSECUTORIAL MISCONDUCT

¶ 153 In proposition five, Stouffer claims that his due process rights were violated due to pervasive prosecutorial misconduct. Stouffer cites to several instances he claims constituted misconduct.[14] We first note that no trial will be reversed on the allegations of prosecutorial misconduct unless the cumulative effect was such to deprive the defendant of a fair trial. *Garrison*, 2004 OK CR 35, ¶ 128, 103 P.3d at 612.

¶ 154 These errors allegedly occurred during closing argument and during the questioning of witnesses. Misconduct which was not brought to the trial court's attention is reviewed under the plain error standard; where objections were lodged, we determine whether the trial court's rulings corrected the error.

¶ 155 First, Stouffer complains that, during the questioning of police Major Neaves, the prosecutor improperly emphasized the fact that Stouffer was allowed to go to the bathroom unattended when he was first taken into custody. Some of these questions were met with objections, which were sustained. He claims the prosecutor allowed the jury to believe that Stouffer could have disposed of gloves when he was in the bathroom.

¶ 156 Ivens testified that he "believed" that Stouffer was wearing gloves at the time of the shooting. Velva testified that Stouffer kept a pair of brown leather gloves in his

---

14. We include the alleged misconduct mentioned in our discussion of proposition four in our cumulative analysis of prosecutorial misconduct.

leather coat pockets. She could not remember if he was wearing the gloves when he left her house before the shooting.

¶ 157 There was a period of time between the shooting and the time Stouffer arrived at Velva's house. After he arrived at Velva's house, he was allowed to go into the bathroom unattended. Even though officers searched, no gloves were ever recovered. The State cannot explain the absence of gloves.

¶ 158 The prosecution made it clear that if he had been wearing gloves, they would have been seized. Major Richard Neaves, an experienced police supervisor, testified that he could not recall if Stouffer was wearing gloves when he came to Velva Ivens's house, but if he had been, the gloves would have been seized. Two less experienced officers allowed Stouffer to go into the bathroom unsupervised. The jury was left to speculate that Stouffer could have disposed of the gloves while he was in the bathroom—or somewhere else before he got to Velva's house.

¶ 159 The comments did not amount to misconduct. The comments were properly based on the evidence and the circumstances surrounding the arrest or apprehension of Stouffer.

■ ¶ 160 Next, Stouffer complains that the prosecutor attempted to elicit sympathy for the victims during first stage closing by arguing that the "woman that Doug Ivens loves" and "Dana Wheat's sister", last words were "no."

¶ 161 There were no objections to these comments, thus we review for plain error only. The argument here was properly based on the evidence, but they were an attempt to elicit an emotional response. These comments did not rise to the level of plain error.

■ ¶ 162 Stouffer next claims that the prosecutor improperly referred to Officer Gibbons's testimony and said that "Gibbons has nightmares about this, you can see the nightmares in his eyes. He smells and he sees Linda Ivens [sic] now. I'm sorry, Linda Reaves." There is no argument or authority by Stouffer showing that this is improper.

Again, there was no objection to these comments—we can review for plain error only.

¶ 163 These comments, too, were calculated to elicit an emotional response. Even so, they did not affect the jury's finding of guilt, thus they did not rise to the level of plain error.

■ ¶ 164 Next, Stouffer claims that the following argument in first stage closing was error:

Bryan Aaron comes in. We were all younger and prettier back then. But some of the aging comes from what we make these folks see and what they saw when they came in that night, what you've now been cursed with, charged with. Doug is trying to get up. Incredibly, Doug is trying to get up. Golly, why doesn't he just die?

¶ 165 There was no contemporaneous objection to this argument. Again, we can review for plain error only. This argument was meant to show that Stouffer shot Ivens with the intent to kill; however, speculation about how it affected this officer was irrelevant. Nevertheless, it did not rise to the level of plain error.

■ ¶ 166 Next, Stouffer claims that the following argument was prejudicial and not supported by the evidence:

[By prosecutor Wintory] He walks back up and he takes this hand—you remember the police describe Linda as still breathing. She is still breathing. She was not conscious and I don't want to—I don't want to say she was, but think about what this says about Bud Stouffer. Her eye followed Bud Stouffer walking across the room just like it followed the officers and the EMT.

MR. JAMES: To which I want to object, Your Honor. There's no evidence. And I understand it's closing.

THE COURT: It's a comment on the evidence. Ladies and gentlemen of the jury, you are the finder of fact. You will determine what the evidence is. Anything the lawyers say is argument. Mr. Wintory, you may continue.

MR. WINTORY: So think about that. Because this is the inference you all get to

draw. If ten, 12, 13 minutes later she still had the autonomic responses to continue with agonal breathing. And for the one eye she still has left in her head to follow the EMTs you can draw the inference that she had it seconds afterwards. And you think about that. If her eye can follow Bryan Aaron and Jim Gibbons as they walk into that room. . . .

¶ 167 Stouffer's quote of the argument stops in mid paragraph, but a full reading of the argument leads to a conclusion that the prosecutor was identifying facts which reveal Stouffer's state of mind at the time of the killing and after the killing. The argument continues.

. . . [by Wintory] He walks back over. She is still breathing. And her left eye is still moving.

And he reaches down and he lifts her arm up and he puts that gun down in there. He's not done yet. That has got to be—that has got to be a real picture of where his heart is.

¶ 168 The prosecution goes on to argue that Stouffer had an hour to clean himself up, get rid of gloves and compose himself before he sees the police. Furthermore, the prosecution argues that Stouffer believed, at that time, that there are no living witnesses, and that even if Doug Ivens is in critical condition, he will not live.

¶ 169 At this point, Stouffer had no idea that Ivens had named him as the shooter, so his cool demeanor and state of mind, which may indicate innocence, had to be explained away by the prosecution. This argument was a fair inference on the evidence and the argument was supported by the evidence introduced at trial.

¶ 170 Stouffer claims, next, that, in first stage closing, the prosecutor improperly called him cold-blooded and stone cold-blooded. There was no objection to these arguments, thus we review for plain error only. In *Hanson*, 2003 OK CR 12, ¶ 15, 72 P.3d at 49–50, this Court held that the argument that the defendant was a "gun-totin', trigger-pullin' carjacker" and a "two-time, cold-blooded murderer" and "jackal" did not rise to the level of plain error because the evidence

supported the conclusion. This Court has also held that the term "cold blooded killer" is not prohibited in a trial where the facts support the conclusion. *DeRosa*, 2004 OK CR 19, ¶ 57, 89 P.3d at 1145–46. There was no error in this "name calling."

¶ 171 Next, Stouffer claims that, during first stage closing argument, the prosecutor improperly argued that the defense failed to prove, or could not prove that Stouffer did not commit the crimes. The first place in the transcript that Stouffer cites, the prosecutor argues that Stouffer did not prove or produce evidence supporting statements made during opening statement. The prosecutor first stated that defense counsel "promised you in his opening statement you were going to hear evidence from the defendant and then he gave a whole bunch of details." However, there were no objections to these initial comments.

¶ 172 After defense counsel's objection, the trial court instructed the jury that the State bears the burden of proof, not the defense. The prosecutor went on,

No doubt about it, folks, the defendant through his lawyer chooses to give an opening statement. The defendant—and I absolutely feel very confident about you all's memory. He said what his proof was going to be, what he was going to prove to you. Not because it's his burden, but because it's his right, that he was going to prove to you the circumstances surrounding the altercation. Big ole check, folks, bounced. No evidence. Insufficient funds on the check he wrote.

¶ 173 The State cites *Stout v. State*, 1984 OK CR 94, 693 P.2d 617, for the premise that this Court has held that this type of argument is proper.

¶ 174 In *Stout*, this Court stated,

The prosecutor also attacked the credibility of defense counsel, a practice of which this Court does not approve. . . . The remarks were made in response to defense counsel's opening statement in which he told the jury he would prove that three people killed the Gandys and that Billy Stout was not one of them, that Billy was physically unable to commit the crime or to

drive the car to Chickasha. Although the prosecutor could have—and should have—pointed out defense counsel's failure to offer such proof without directly attacking defense counsel's credibility, we do not find that the remarks prejudiced the defendant. . . .

Furthermore, the trial court admonished the jury that these totally improper remarks were not evidence and should not be considered. Admonishing the jury usually cures error, if any, unless the error appears to have determined the verdict. . . . The evidence against appellant was conclusive albeit circumstantial. Any error was cured by the admonition.

*Stout,* 1984 OK CR 94, ¶ 42, 693 P.2d at 627 [internal citations omitted]

¶ 175 Stouffer's argument then turns to the burden to prove self-defense. Stouffer mischaracterizes the argument by saying that the prosecutor told the jury that he did not have to prove that Stouffer was not acting in self-defense.

¶ 176 Actually, the prosecutor argued that he had to prove that Stouffer was there and it was not self-defense. He states, in relation to self-defense, "there's no evidence of self-defense." Defense counsel then objects as improper because the trial court instructed on self-defense, so there must be some evidence of self-defense. The trial court ruled that the argument was proper.

 ¶ 177 Stouffer argues, based on these two prosecution arguments, that the burden was improperly shifted to the defense to prove that Stouffer did not commit first-degree murder. Stouffer's first argument reveals a desire, by the prosecutor, to point out that Stouffer, or his attorney, did not live up to their word. As in *Stout,* this is an attack on the credibility of defense counsel. However, as in *Stout,* the trial court admonished the jury regarding the burden of proof. This Court finds that the admonishment cured the error and that this argument did not determine the verdict.

¶ 178 Stouffer's claim regarding the self-defense evidence is not persuasive. The prosecutor was merely pointing out the lack of evidence supporting a self-defense claim—showing that the State met its burden of showing that Stouffer did not act in self-defense. The argument here was properly within the bounds of argument

 ¶ 179 Lastly, Stouffer argues that the prosecutor elicited irrelevant and highly prejudicial testimony from officer James Gibbons. The prosecutor elicited from Gibbons that he (Gibbons) had never seen anything like this crime scene prior or since. Gibbons was asked about the condition of Reaves. He was able to testify that as he walked through the scene, he believed that Reaves' eye followed him and he believed she was conscious of his presence. He said it was frightening.

¶ 180 The prosecutor asked Gibbons about Reaves's breath sounds. The questioning did not garner an objection by defense counsel. Therefore, we can review for plain error only.

¶ 181 Stouffer claims this questioning was calculated to garner sympathy for the victim. On the contrary, this questioning was elicited to show the impact of the scene on the first responders. It was also used to show why they moved the pistol. The questioning was as follows:

[by Gibbons] . . . I saw Ms. Reaves on the sofa in the living room.

Q. [by Wintory] You just closed your eyes.

A. Yeah. I—I had never in my life seen anything like that prior to or since. She had a—she had a head wound—her skull was exposed to the brain. She had been shot in the head. And she was seated on the sofa on the couch. And beside her head—to the south of her head and beside her right hand and arm was a revolver. Appeared to be a .357 revolver Colt Python.

I said to Officer Aaron, because I heard her Ms. Reaves breathing, I said, "she's still alive. I'm going to have to move this weapon." Because it was within reach of her hand. . . . I told Bryan, "She's still alive. I don't want an accident. I don't want anything else to happen."

¶ 182 Further on, the prosecutor asked Gibbons if there was something else that led

him to believe that Reaves was still alive. Gibbons testified that when he retrieved the firearm and moved across the room to talk to officer Aaron, he believed that her left eye followed him, and "that she was conscious of my presence and that her eye actually moved and saw that something was happening in front of her. It was frightening."

¶ 183 Stouffer points out the fact that this testimony was also later rendered from Officer Aaron who testified that Reaves began to breathe as they approached her, even though they thought she was brain dead. They then thought she was alive, so they moved the pistol for safety reasons. This testimony was relevant to show why the officers moved the pistol and to show there were no ulterior motives in changing the scene of the crime.

¶ 184 Some of these comments and questions do amount to prosecutorial misconduct, but the cumulative effect of this misconduct is not sufficient to warrant reversal in this case.[15]

## IX. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

¶ 185 In proposition seven, Stouffer claims that trial counsel rendered ineffective assistance of counsel in violation of his constitutional rights. This proposition relates to proposition six, as far as counsel failed to object to the admitted evidence. In addition, Stouffer requests an evidentiary hearing to examine evidence, which was available but not utilized by defense counsel because of ineffective assistance.

¶ 186 Addressed first is the failure to object to items mentioned in proposition six. In order to show that counsel was ineffective, Stouffer must show both deficient performance and prejudice. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).[16] In *Strickland,* the Court went on to say that there is a strong presumption that counsel's

conduct falls within the wide range of reasonable professional conduct, i.e., an appellant must overcome the presumption that, under the circumstances, counsel's conduct constituted sound trial strategy. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

¶ 187 To establish prejudice, Stouffer must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

¶ 188 In the context of a capital sentencing proceeding, the relevant inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069.

¶ 189 The items complained about in proposition six, which were irrelevant and possibly should have received an objection, were the comments on the officer's nightmares and how the crime affected the officers and first responders and the testimony of Reaves's sister, Dana Wheat, about their relationship. The fact that Reaves was Wheat's last living relative was irrelevant to the guilt innocence stage.

¶ 190 The failure to object to the evidence does not rise to the level of ineffective assistance because Stouffer cannot show that the testimony prejudiced his first stage case. The evidence of guilt in this case was overwhelming and the argument and Wheat's testimony did not prejudice Stouffer in any way.

¶ 191 Stouffer complains that trial counsel did not pursue a *Brady* claim based on the State's evidence that was in the custody of Joyce Gilchrist at some point in time. The evidence (blood evidence) had been han-

**15.** None of this alleged misconduct comes close to the misconduct we condemned in *Mitchell v. State,* 2006 OK CR 20, ¶ 101, 136 P.3d 671, 710.

**16.** The *Strickland* standard continues to be the correct test for examining claims of ineffective

assistance of counsel where counsel fails to utilize mitigation evidence. *Bell v. Cone,* 535 U.S. 685, 698, 122 S.Ct. 1843, 1852, 152 L.Ed.2d 914 (2002).

dled by Joyce Gilchrist at the Oklahoma City Police Crime Lab. Defense counsel requested information relating to Gilchrist and this evidence, but none was ever produced.

¶ 192 He claims that the mere fact that Gilchrist handled the evidence at some point in time makes the results of any testing unreliable. He cites to a memorandum which states that Stouffer's shirt and jacket were missing for some time.[17] Obviously, these items were found in 2001 because they were sent for independent testing which resulted in the inconclusive results.

¶ 193 Officers testified that these items were in the same condition as when they first observed them. Any weakness in chain of custody goes to the weight to be given to the evidence and does not prevent admissibility. *Brown*, 1998 OK CR 77, ¶ 58, 989 P.2d at 929. The evidence here was admissible and the jury could give the evidence whatever weight it was due. Defense counsel was not ineffective based on this claim.

¶ 194 Stouffer next claims that trial counsel was ineffective for failing to utilize evidence that showed that there was DNA evidence from an unknown source found on Ivens's shirt. This DNA evidence excluded Doug Ivens, Linda Reaves and B.J. Stouffer. The trial attorney had this information and had endorsed two witnesses to testify about this evidence; however, trial counsel did not use this evidence at trial.[18]

¶ 195 In the earlier proposition, Stouffer attacks the handling of his own shirt and jacket while in the custody of the Oklahoma City Police Lab, and then he ignores all of the fallacies of this lab when he wants to introduce this evidence. However, this does not explain the failure to take advantage of further testing. The resolution of this issue lies in the facts of this case, which shows that the speck of unknown blood is not exculpatory. Exculpatory evidence is evidence that if admitted would create reasonable doubt that did not exist without the evidence. *Ellis v. Mullin*, 326 F.3d 1122, 1128 (10th Cir.2002).

¶ 196 Determining whether this DNA evidence is exculpatory involves a determination that the evidence was favorable to the defense and a showing of "materiality"—that there is a reasonable probability that, had it been utilized by the defense, the result of the proceeding would have been different. *See Van Woudenberg v. State*, 1997 OK CR 38, ¶ 10, 942 P.2d 224, 227–28. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Sadler v. State*, 1993 OK CR 2, ¶ 19, 846 P.2d 377, 383. The "mere possibility" that an item might have affected the outcome of the trial does not establish "materiality" in the constitutional sense. *Van Woudenberg*, 1997 OK CR 38, ¶ 10, 942 P.2d at 228.

¶ 197 Stouffer admitted, to Velva Ivens, that he shot Doug Ivens. He left a living witness in Doug Ivens. He has shown no reason for Doug Ivens to lie other than the unsubstantiated theory that Doug Ivens

---

17. In a memorandum contained in the appendix to the motion for evidentiary hearing, there is reference to a missing shirt in the Stouffer case. Another memo, dated October 2000, shows that the jacket was found at the District Court.

18. Stouffer has filed a motion for evidentiary hearing based on this claim so that he might be able to supplement the record with this evidence. The evidence contained in the motion for new trial consists of results of DNA testing by Reliagene Technologies, Inc. (Reliagene). The three samples (# 02–5110—a stain on the left sleeve of Doug Ivens plaid shirt; # 02–5111—from the right front of the shirt; and # 02–5112—from the left front pocket of the shirt), sent to Reliagene resulted in a negative presumptive test for blood, but testing on # 02–5110 revealed DNA which did not match Doug Ivens, Linda Reaves or B.J. Stouffer. The report from Reliagene states that the results are consistent with a mixture of at least two unknown DNA donors. The documents reveal that these results were sent to Stouffer's trial attorney on January 11, 2003.

The affidavits in the appendix to the application for evidentiary hearing state that the Innocence Project was willing to aid in getting these items tested, but trial counsel never attempted to utilize their services. According to the Innocence Project, they contacted attorney Gary James on the second day of trial, but James never called them back.

There is some attempt to say that Stouffer was offered assistance from the Innocence Project in the testing of this evidence, but the Oklahoma Indigent Defense System [OIDS] told him that if he accepted the assistance, they would no longer be allowed to represent him as indigent. OIDS would not provide funding for the testing.

killed Reaves before he got there. None of the evidence supports this theory. One speck of unknown blood in this case is not exculpatory to Stouffer.

¶ 198 This evidence does not contain sufficient information to show by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize this evidence. *See* Rule 3.11(B)(3)(b), *Rules of the Court of Criminal Appeals,* Title 22, Ch. 18, App. (2006). Stouffer also wants testing of Ivens's pants pockets even though there is no evidence that there is blood in his pockets. This request is speculative at best.

¶ 199 Next, Stouffer claims that counsel was ineffective for failing to utilize evidence that consists of reports of suspicious vehicles in the area and screaming on the golf course on the night of the crime. This information is contained in the motion for evidentiary hearing based on his ineffective assistance claim. He claims that counsel should have discovered this evidence through discovery.

¶ 200 Stouffer claims that police reports indicate that an individual called to report suspicious vehicle and suspicious activity in the area on the night of the killing. He claims this evidence was necessary to show that Reaves was already dead when he arrived at Ivens's home. This evidence does not provide clear and convincing evidence that counsel was ineffective for failing to discover and use this evidence.

¶ 201 Stouffer's application for evidentiary hearing shall be denied. He has not presented clear and convincing proof to this Court that counsel was ineffective for failing to present this evidence, thus entitling him to an evidentiary hearing on this extra-record evidence and to have the record supplemented with the evidence. *See* Rule 3.11 ("the application and affidavits must contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective.")

## X. CUMULATIVE ERROR

¶ 202 Stouffer claims in a separate proposition that, if none of the errors require reversal individually, then the cumulative effect of the errors taken together do require reversal of the conviction or modification of the sentence.

¶ 203 Arguably, there was error in proposition three, when the prosecution was allowed to present evidence that Stouffer attacked Mr. McCormack. However, this error would have only affected the first stage of trial. The evidence would have been admissible in the second stage.

¶ 204 Arguably, some of the prosecutor's remarks during closing argument were irrelevant and meant to elicit an emotional response from the jury. However, they received no objection. We found that the errors did not amount to plain error. These instances, when viewed in light of the entire closing argument do not amount to plain error. We also found error in the introduction of the photograph of Ivens's scarred abdomen, but the error alone was harmless.

¶ 205 These first stage errors, even taken as a whole did not affect the outcome of this case. The evidence, as stated before, in any light was overwhelming. Stouffer left a living eyewitness; one who he has not shown has any reason to lie about what happened or whose testimony is in any way impeached.

¶ 206 There was also error in the victim impact evidence. However, it was the only error found during the second stage. We can look at the first stage errors and combine them with this error to determine whether they affected the jury in returning the sentence of death. However, even this analysis comes up short. None of these alleged or possible errors viewed in a cumulative fashion caused Stouffer to receive an unfair trial.

## XI. MANDATORY SENTENCE REVIEW.

¶ 207 Title 21 O.S.2001, § 701.13, requires this Court to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance." Under this heading, we will also discuss Stouf-

fer's claims that Oklahoma's death penalty provisions are unconstitutional.

¶ 208 In propositions seven and fifteen, Stouffer claims that the death penalty is unconstitutional as there is likelihood and an innocent person may be executed and that Oklahoma's method of execution constitutes cruel and unusual punishment.[19] We have previously ruled on this issue and find no reason to reverse our position on this issue. *Frederick v. State*, 2001 OK CR 34, ¶¶ 173–74, fn. 13, 37 P.3d 908, 950–51; *also see Dodd v. State*, 2004 OK CR 31, ¶ 110, 100 P.3d 1017, 1049.

■■■ ¶ 209 Stouffer's argument that Oklahoma's method of execution is cruel and unusual is not supported by argument or case law as required by our rules, thus, this issue is waived. *See* Rule 3.5(A) and (C), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2005); *see also Murphy v. State*, 2005 OK CR 25, ¶ 57–58, 124 P.3d 1198, 1209. We find no reason to address this issue without it being properly before us.[20]

■■■ ¶ 210 We found above that there was sufficient evidence to support the finding of the two statutory aggravating circumstances. After reviewing the entire record in this case, we find that the sentence of death was not imposed because of any arbitrary factor, passion, or prejudice. Stouffer presented mitigating evidence, which was summarized and listed in an instruction to the jury.

1. The defendant's age.
2. The defendant has been helpful to others.
3. The defendant was respectful to Bill McCormack and Doug Ivens.
4. The defendant had a great relationship with Emily and Holly Ivens.
5. The defendant was a good man to Velva Ivens.
6. The defendant worked for the 700 Club.
7. The defendant was teaching Mr. Stuart to read after a stroke.
8. The defendant was good with the children in the neighborhood at Cedar Lake, Hinton, Oklahoma.
9. The defendant works as a Christian counselor.
10. The defendant is a good son to Joyce Stouffer.
11. The defendant is very spiritual.
12. The defendant is a good father to Trey Stouffer.
13. The defendant has the respect and love of his friends and family.
14. The defendant was a good friend to many.
15. The defendant taped Church services for the homebound.
16. The defendant will continue to have a relationship with his son and mother.

¶ 211 In addition, the trial court instructed that the jury could decide that other mitigating circumstances exist and they could consider them as well.

¶ 212 We can honestly say that the jury's verdict was not born under the influence of passion, prejudice or any other arbitrary factor, and the evidence supported the jury's findings of the aggravating circumstances. *See* 21 O.S.2001, § 701.13. Stouffer's convictions and his sentences should be affirmed. We find no error warranting reversal of Stouffer's conviction or sentence of death for first-degree murder, therefore, the Judgment and Sentence of the trial court is, hereby, **AFFIRMED.**

19. Stouffer cites *Herrera v. Collins*, 506 U.S. 390, 419, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (holding that the execution of an innocent individual would be "a constitutional intolerable event.") and *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 2252, n. 25, 153 L.Ed.2d 335 (2002), where the court stated that "in recent years a disturbing number of inmates on death row have been exonerated."

20. This Court held in *Malicoat v. State*, 2006 OK CR 25, ¶ 10, 137 P.3d 1234, 1238–39, that Oklahoma's execution protocol does not violate constitutional prohibitions against cruel and unusual punishment.

LUMPKIN, V.P.J. and C. JOHNSON, J.: concur.

CHAPEL, P.J. and A. JOHNSON, J. concur in results.